# KUGLER, ATTORNEY GENERAL OF NEW JERSEY, ET AL. *v.* HELFANT

No. 74–80.  Argued March 25, 1975—Decided April 28, 1975*

---

*Together with No. 74–277, *Helfant* v. *Kugler, Attorney General of New Jersey, et al.,* also on certiorari to the same court.

Stewart, J., delivered the opinion of the Court, in which Burger, C. J., and White, Marshall, Blackmun, Powell, and Rehnquist, JJ., joined. Douglas, J., took no part in the consideration or decision of the cases. Brennan, J., took no part in the decision of the cases.

*David S. Baime,* Deputy Attorney General of New Jersey, argued the cause for petitioners in No. 74–80 and respondents in No. 74–277. With him on the briefs were *William F. Hyland,* Attorney General, and *Glenn E. Kushel,* Deputy Attorney General.

*Marvin D. Perskie* argued the cause for petitioner in No. 74–277 and respondent in No. 74–80. With him on the briefs was *Patrick T. McGahn, Jr.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Edwin H. Helfant brought this action in Federal District Court to enjoin the Attorney General of New Jersey and other New Jersey officials from proceeding with the prosecution of an indictment pending against him in that State.[1] His complaint alleged that he had been coerced into testifying before a state grand jury by the concerted action of a State Deputy Attorney General and members of the New Jersey Supreme Court, and that the indictment, charging him with obstruction of justice and false swearing, had grown out of that coerced testimony. His complaint further alleged that the significant role played by the members of the New Jersey Supreme Court in coercing his testimony made it impossible for him to receive a fair trial in the state-court system.

The District Court dismissed the complaint on the ground that the principles of *Younger* v. *Harris,* 401 U. S. 37, precluded federal intervention in the state criminal proceeding. A three-judge panel of the Court of Appeals for the Third Circuit reversed that order and remanded the case to the District Court for a hearing on the merits of Helfant's request for a permanent injunction. 484 F. 2d 1277. Upon petition of the defendant state officials (hereinafter the State), the Court of Appeals then set the case for an en banc rehearing. The full Court of Appeals held that a permanent injunction against the state criminal prosecution would be inappropriate, but, with three judges dissenting, nonetheless reversed the trial court's order of dismissal. The Court

---

[1] The complaint relied upon 42 U. S. C. § 1983 in seeking injunctive relief against the state court proceedings. Federal jurisdiction was grounded on 28 U. S. C. § 1343 (3).

of Appeals remanded the case for the purpose of an evidentiary hearing in the District Court on Helfant's charge that his grand jury testimony had been coerced, and for the entry of a declaratory judgment, based upon that hearing, on the question whether Helfant's grand jury testimony should be admitted into evidence at the state criminal trial. The District Court was directed to enjoin further proceedings in the state criminal prosecution pending entry of its declaratory judgment. 500 F. 2d 1188.

The State filed a petition for a writ of certiorari, seeking review of the Court of Appeals' remand to the District Court for an evidentiary hearing and declaratory judgment on the issue of coercion. Helfant filed a cross-petition for a writ of certiorari, challenging the Court of Appeals' decision that permanent injunctive relief was not warranted. We granted both petitions to consider the propriety of federal-court intervention in pending state criminal proceedings in the circumstances of this case. 419 U. S. 1019.

I

Helfant was a Municipal Court Judge and a member of the New Jersey bar. He was subpoenaed to appear on October 18, 1972, before a state grand jury. There he was advised that he was a target of the grand jury's investigation into an episode allegedly involving corruption of the process of state criminal justice. Upon the advice of counsel, he invoked his constitutional privilege against compulsory self-incrimination and refused to testify before the grand jury. He was again subpoenaed to appear before the grand jury on November 8, 1972. On November 6, 1972, he received a telephone call from the Administrative Director of the New Jersey Courts requesting him to come to the conference room of the

Justices of the New Jersey Supreme Court on the morning of November 8 just before his scheduled grand jury appearance.[2] He complied with this request.

In his federal complaint, Helfant alleged that at that meeting he was interrogated by the Chief Justice and other members of the Supreme Court concerning the subject matter of the grand jury investigation, including matters not then public, and was also sharply questioned about the propriety of a Municipal Judge's invoking the privilege against compulsory self-incrimination before a grand jury. The complaint further alleged that the Justices' questions were based on grand jury minutes that had been provided them by the Deputy Attorney General who was conducting the grand jury investigation, and who had been present in the conference room of the Supreme Court both before and after Helfant's interview.

The federal complaint went on to allege that as a result of this questioning Helfant, "fearing not only the loss of Judgeship, but for his accreditation as a member of the bar as well," indicated to the Justices that he would waive his privilege and testify in full before the grand jury. After leaving the conference room, Helfant did testify before the grand jury, denying any improper involvement in the episode under investigation. Some two months later the grand jury returned an indictment charging Helfant with conspiracy to obstruct justice, obstruction of justice, compounding a felony, and with four counts of false swearing.

The federal complaint finally alleged that federal injunctive relief was necessary because it would be im-

---

[2] The grand jury was then sitting in Trenton, N. J., in the State House Annex on the same floor as the conference room of the Justices of the State Supreme Court. See 500 F. 2d 1188, 1190.

possible for Helfant to receive a fair trial in the New Jersey state courts:

"As a result of the intrusion by the Deputy Attorney General and the disclosure to the Supreme Court of factual matters involved in a Grand Jury investigation during pendency of that investigation, and because of the intrusion of the New Jersey Supreme Court into the Grand Jury investigation and the communication between the Supreme Court of New Jersey and the Deputy Attorney General conducting the Grand Jury investigation, the plaintiff herein is made to suffer great, immediate, substantial and irreparable harm in that he must attempt to defend criminal charges brought in a State in which there has been prejudicial collusion directly affecting plaintiff, whether intentional or inadvertent between the Judicial and Executive branches of the New Jersey State government. Plaintiff is being made to defend criminal charges which have been obtained, inter alia, as a result of that collusion, and the deprivation of plaintiff's constitutional rights by not too subtle cooperative coercion on the part of the defendants. Furthermore, in the event of his conviction upon any one of the charges presently pending against him, plaintiff's only recourse would be review by the State Courts and ultimately the New Jersey Supreme Court, which Court he has alleged has been involved in the prosecution of the charges against him. Thus, any defense by plaintiff in other charges in State Court would be totally futile, because he would have to defend charges at the trial level, with the Trial Court fully cognizant of the 'interest' of the Supreme Court in the charges, and could only seek review of his pretrial motions and trial motions and appeals in the same court that he

alleges has unlawfully injected itself into the prosecution of the charges against him and unlawfully deprived him of his constitutional rights. The conclusion must be that the State is engaging in a bad faith prosecution of the plaintiff herein, and for this reason he seeks a permanent injunction against the further prosecution of the State proceedings . . . ."

## II

In *Younger* v. *Harris, supra,* and its companion cases,[3] the Court re-examined the principles governing federal judicial intervention in pending state criminal cases, and unequivocally reaffirmed "the fundamental policy against federal interference with state criminal prosecutions." 401 U. S., at 46. This policy of restraint, the Court explained, is founded on the "basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.,* at 43-44. When a federal court is asked to interfere with a pending state prosecution, established doctrines of equity and comity are reinforced by the demands of federalism, which require that federal rights be protected in a manner that does not unduly interfere with the legitimate functioning of the judicial systems of the States. *Id.,* at 44. Accordingly, the Court held that in the absence of exceptional circumstances creating a threat of irreparable injury " 'both great and immediate,' " a federal court must not intervene by way of either injunction or declaratory judgment in a pending state criminal prosecution.

---

[3] *Samuels* v. *Mackell,* 401 U. S. 66; *Boyle* v. *Landry,* 401 U. S. 77; *Perez* v. *Ledesma,* 401 U. S. 82; *Dyson* v. *Stein,* 401 U. S. 200; *Byrne* v. *Karalexis,* 401 U. S. 216.

Although the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do not constitute "irreparable injury" in the "special legal sense of that term," *id.*, at 46, the Court in *Younger* left room for federal equitable intervention in a state criminal trial where there is a showing of "bad faith" or "harassment" by state officials responsible for the prosecution, *id.*, at 54, where the state law to be applied in the criminal proceeding is " 'flagrantly and patently violative of express constitutional prohibitions,' " *id.*, at 53, or where there exist other "extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." *Ibid.* In the companion case of *Perez* v. *Ledesma,* 401 U. S. 82, the Court explained that "[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." *Id.*, at 85. See *Mitchum* v. *Foster,* 407 U. S. 225, 230–231.

The policy of equitable restraint expressed in *Younger* v. *Harris,* in short, is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights. See *Steffel* v. *Thompson,* 415 U. S. 452, 460. Only if "extraordinary circumstances" render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irrep-

arable injury as to warrant intervention in state criminal proceedings.[4] But whatever else is required, such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation.

As the Court of Appeals recognized, Helfant's allegations that members of the New Jersey Supreme Court were involved in coercing his grand jury testimony must, for present purposes, be assumed to be true.[5] It is

---

[4] The scope of the exception to the general rule of equitable restraint for "other extraordinary circumstances" has been left largely undefined by this Court. In *Younger* v. *Harris,* 401 U. S. 37, however, the Court gave one example of the type of circumstances that could justify federal intervention even in the absence of either harassment or bad-faith enforcement of a state criminal statute, by quoting from *Watson* v. *Buck,* 313 U. S. 387, 402:

" 'It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' " 401 U. S., at 53–54.

The Court then stated: "Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be." *Id.,* at 54.

*Gibson* v. *Berryhill,* 411 U. S. 564, supplied another example of such "extraordinary circumstances." In that case the Court found it unnecessary to decide whether the rule of *Younger* v. *Harris* applies with the same force when state civil, rather than criminal, proceedings are pending because "the predicate for a *Younger* v. *Harris* dismissal was lacking . . . . [T]he appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board." 411 U. S., at 577.

[5] Although the District Court held a limited evidentiary hearing on Helfant's request for a preliminary injunction, the State's motion to dismiss was granted pursuant to Fed. Rule Civ. Proc. 12 (b) (6) without either findings of fact or conclusions of law. Accordingly,

Helfant's position that these are such "extraordinary circumstances" as to justify enjoining his criminal trial in view of the formidable supervisory and administrative powers exercised by the New Jersey Supreme Court over the entire state-court system. We cannot agree that these facts bring this litigation within any exception to the basic *Younger* rule.[6]

The New Jersey Constitution provides that the Chief Justice of the State Supreme Court shall be the "administrative head" of all the courts in the State. Art. VI, § 7, ¶ 1. The State Constitution further provides that "[t]he Chief Justice of the Supreme Court shall assign Judges of the Superior Court to the Divisions and Parts of the Superior Court, and may from time to time transfer Judges from one assignment to another, as need appears." *Id.*, ¶ 2.

The New Jersey Supreme Court itself has explained that the State Constitution vests it with "plenary responsibility for the administration of all courts in the State." *State* v. *De Stasio*, 49 N. J. 247, 253, 229 A. 2d 636, 639. "Thus this court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to

---

in determining whether the complaint stated a claim upon which relief could be granted, its factual allegations were to be taken as true. See, *e. g., Cruz* v. *Beto*, 405 U. S. 319, 322.

[6] Although Helfant argues that the collusive actions of members of the State Supreme Court and the Deputy Attorney General demonstrate prosecutorial bad faith warranting federal intervention, "bad faith" in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction. See *Perez* v. *Ledesma*, 401 U. S., at 85. Nothing in Helfant's complaint would support a finding of "bad faith," as so defined. However he may choose to describe it, the gravamen of Helfant's complaint is that members of the New Jersey judiciary have become so personally involved in his case that it is impossible for him to receive a fair hearing in the state-court system.

achieve it." *In re Mattera,* 34 N. J. 259, 272, 168 A. 2d 38, 45.

It is clear, therefore, that the State Supreme Court, and particularly its Chief Justice, are vested with considerable administrative authority over the trial court that will initially determine Helfant's federal constitutional claims if the criminal prosecution is allowed to proceed. And, of course, those claims are predicated in large measure on charges of improper conduct on the part of some Justices of the New Jersey Supreme Court. It is impossible to conclude from these considerations, however, that the objectivity of the entire New Jersey court system has been irretrievably impaired so far as Helfant is concerned.

Helfant does not allege, and it certainly cannot be assumed, that no trial judge in New Jersey will be capable of impartially deciding his case simply because of the alleged previous involvement of members of the New Jersey Supreme Court. To be sure, it is conceivable that there might be a judge in the State who, in an effort to curry favor or to avoid administrative transfer to a less desirable assignment, would decide the case with an eye to the supposed attitudes of his superiors in the judicial hierarchy. But even if such a judge were assigned to hear Helfant's case, the right to a fair trial would be protected by the New Jersey rule that permits a defendant to disqualify a particular judge from participating in his case. See New Jersey Court Rules 1:12–1 to 1:12–3.

Although appellate review of a conviction at the trial level might ultimately reach the State Supreme Court, New Jersey requires judges personally interested "in the event of the action" to disqualify themselves. Indeed, disqualification is mandatory whenever there is any reason "which might preclude a fair and unbiased hear-

ing and judgment, *or which might reasonably lead counsel or the parties to believe so."* Rules 1:12–1 (e) and (f) (emphasis added). If, because of such disqualifications, the Supreme Court were deprived of the requisite five-member quorum, temporary assignment of substitute Justices is authorized by the New Jersey Court Rules. Rule 2:13–2. Thus, the New Jersey judicial system provides procedural safeguards to guarantee that Helfant will not be denied due process of law in the state trial or appellate process.

It is worth noting, furthermore, that four of the six Justices who attended the meeting with Helfant are no longer members of the New Jersey Supreme Court. Of the two remaining members, only one was alleged to have been active in the questioning. The other active interrogator named by Helfant, the then Chief Justice, is among the four former Justices who are no longer members of the court.

Moreover, it is not the New Jersey Supreme Court, or its members, but the Chief Justice, who is the "administrative head" of the New Jersey court system. Thus, it is the present Chief Justice who wields the extensive supervisory and administrative power relied upon by Helfant to support his prayer for federal equitable relief. And the present Chief Justice played no part whatsoever in the allegedly coercive meeting that forms the core of Helfant's constitutional claim. In sum, even if it could be assumed, *arguendo,* that the former Chief Justice and the other participants in the meeting with Helfant might have been incapable of impartially reviewing his case, there can be no such assumption of bias with respect to the new Chief Justice and the other new members of the New Jersey Supreme Court.[7]

---

[7] Similarly, there can be no reason to assume that trial and appellate judges under the supervisory authority of the new Chief

Accordingly, Helfant's claim that he cannot receive a fair hearing in the state-court system is without foundation. The Court of Appeals, therefore, properly affirmed the District Court's dismissal of his prayer for permanent injunctive relief.

### III

Although the Court of Appeals held that there was in this case "no reason to depart from the formidable general policy of 'leaving generally to the state courts the trial of criminal cases arising under state laws . . . ,'" 500 F. 2d, at 1196,[8] it nonetheless concluded that federal declaratory relief on the question of the admissibility in evidence of Helfant's grand jury testimony was in order. It was the court's view that federal factfinding on this narrow issue would free the New Jersey courts from even the appearance of partiality. By thus assuring the integrity of the state judicial process without ultimately interfering with the State's right to enforce its own criminal laws, the court reasoned, federal judicial action would advance, rather than offend, "the mutual relationship poignantly described by Justice Black as 'Our Federalism.'" *Id.*, at 1197. The court accordingly required the District Court to enjoin further proceedings in the state criminal trial until an evidentiary hearing could be held in the federal court to determine whether Helfant's grand jury testimony should be admitted as evidence in that trial.

This procedure closely resembles the course rejected by this Court in *Stefanelli* v. *Minard*, 342 U. S. 117. In *Stefanelli* the Court affirmed the refusal of a Federal District Court to entertain proceedings to suppress the use in

---

Justice will be influenced by the role played by former members of the State Supreme Court in inducing Helfant's grand jury testimony.

[8] The internal quotation is from *Douglas* v. *City of Jeannette,* 319 U. S. 157, 163.

a pending state prosecution of evidence allegedly obtained in an unlawful search. As the Court explained: "If the federal equity power must refrain from staying State prosecutions outright to try the central question of the validity of the statute on which the prosecution is based, how much more reluctant must it be to intervene piecemeal to try collateral issues." *Id.,* at 123. The Court thus held that "federal courts should refuse to intervene in State criminal proceedings to suppress the use of evidence even when claimed to have been secured by unlawful search and seizure." *Id.,* at 120. Similarly, in *Perez* v. *Ledesma, supra,* the Court held: "[T]he propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals, . . . subject, of course, to review by certiorari or appeal in this Court or, in a proper case, on federal habeas corpus." 401 U. S., at 84–85. See also *Cleary* v. *Bolger,* 371 U. S. 392.

These precedents clearly establish that at least in the absence of "extraordinary circumstances" federal courts must refuse to intervene in state criminal proceedings to suppress the use of evidence claimed to have been obtained through unlawful means.[9] Even if concern for the *appearance* of complete impartiality could in some case conceivably justify such disruption of state criminal proceedings, this is not such a case. By providing for mandatory disqualification of a judge of any court whenever one of the parties or his counsel rationally believes there exists any reason that might preclude a fair and unbiased hearing, N. J. Court Rule 1:12–1 (f), New

---

[9] In *Dombrowski* v. *Pfister,* 380 U. S. 479, 485 n. 3, the Court noted: "It is difficult to think of a case in which an accused could properly bring a state prosecution to a halt while a federal court decides his claim that certain evidence is rendered inadmissible by the Fourteenth Amendment."

Jersey has preserved the appearance of judicial objectivity. And, as explained in Part II, *supra,* Helfant's claim that he cannot in fact obtain a fair hearing in the state-court system is without merit.

In short, the basic policy against federal interference with pending state prosecutions would be .frustrated as much by the declaratory judgment procedure ordered by the Court of Appeals as it would be by the permanent injunction originally sought by Helfant. See *Samuels* v. *Mackell,* 401 U. S. 66, 73. Accordingly, the judgment of the Court of Appeals is vacated, and the cases are remanded to that court with directions to enter a judgment affirming the District Court's dismissal of the complaint.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of these cases. MR. JUSTICE BRENNAN took no part in the decision of these cases.