MOORE ET AL. *v.* SIMS ET UX.

No. 78–6.   Argued February 26, 1979—Decided June 11, 1979

416

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, *post,* p. 435.

*David H. Young,* Assistant Attorney General of Texas, argued the cause for appellants. With him on the brief were *John L. Hill,* Attorney General, *David M. Kendall,* First As-

sistant Attorney General, and *Steve Bickerstaff, Kathryn A. Reed,* and *Ann Clarke Snell,* Assistant Attorneys General.

*Windell E. Cooper Porter* argued the cause for appellees. With her on the brief were *Robert L. Byrd* and *Martin J. Grimm.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Title 2 of the Texas Family Code was enacted in 1973 and first went into effect on January 1, 1974. It was amended substantially in the following year. The Title defines the contours of the parent-child relationship and the permissible areas and modes of state intervention. This suit presents the first broad constitutional challenge to interrelated parts of that statutory scheme. It raises novel constitutional questions of the correlative rights and duties of parents, children, and the State in suits affecting the parent-child relationship.

This litigation, involving suspected instances of child abuse, was initiated by state authorities in the Texas state courts in 1976. The state proceedings, however, were enjoined by the three-judge District Court below, which went on to find various parts of Title 2 unconstitutional on their face or as applied. We noted probable jurisdiction. 439 U. S. 925 (1978). This appeal first raises the question whether in light of the pending state proceedings, the Federal District Court should have exercised its jurisdiction. We conclude that it should not have done so and accordingly reverse and remand with instructions that the complaint be dismissed.

I

The appellees in this case, husband and wife and their three minor children, seek a declaration that parts of Title 2 of the

---

*Briefs of *amici curiae* urging affirmance were filed by *Catherine P. Mitchell* and *Martin A. Schwartz* for Community Action for Legal Services, Inc., et al.; by *Gary R. Thomas, Robert B. O'Keefe,* and *Steven D. Ross* for East Texas Legal Services, Inc.; and by *Stefan Rosenzweig* and *Jeanette Ganousis* for Wanda Dixie et al.

Texas Family Code unconstitutionally infringe family integrity.[1] The state-court litigation was precipitated by school authorities who reported to the Texas Department of Human Resources (formerly the State Department of Public Welfare) on March 25, 1976, that a child, Paul Sims, suffered from physical injuries apparently inflicted or aggravated by his father on a visit to the Osborne Elementary School in Houston, Tex. To protect the Sims children and to investigate the extent of any injuries, the Texas Department of Human Resources (hereinafter Department) on the same day took temporary custody of all three Sims children, who were in the school, and had them examined by a physician. The doctor found that the children were battered, and Paul was hospitalized for 11 days.

On the day that it took custody of the children, the Department decided to institute a suit for emergency protection of the children under § 17.02 of the Texas Family Code.[2] The suit was filed in the Harris County Juvenile Court on

---

[1] Although it is not clear that the children were nominal parties in all of the proceedings in the state courts, for ease of reference all of those actions will be referred to as actions by the appellees.

[2] Chapter 17 of Title 2 of the Texas Family Code provides for suits for protection of children in emergencies. Section 17.01 states:

"An authorized representative of the State Department of Public Welfare, a law-enforcement officer, or a juvenile probation officer may take possession of a child to protect him from an immediate danger to his health or physical safety and deliver him to any court having jurisdiction of suits under this subtitle, whether or not the court has continuing jurisdiction under Section 11.05 of this code. The child shall be delivered immediately to the court." Tex. Fam. Code Ann., Tit. 2, § 17.01 (Supp. 1978–1979).

These emergency seizures are to be followed by hearings provided for in § 17.02 (1975):

"Unless the child is taken into possession pursuant to a temporary order entered by a court under Section 11.11 of this code, the officer or representative shall file a petition in the court immediately on delivery of the child to the court, and a hearing shall be held to provide for the temporary care or protection of the child."

March 26, 1976, the day after the children were removed from the school. Pursuant to § 17.04 of the Texas Code, the Juvenile Court Judge entered an emergency *ex parte* order which gave temporary custody of the children to the Department.[3]

Five days later, the appellees appeared in court and moved to modify the *ex parte* order, the proper procedure for terminating the Department's temporary custody.[4] A hearing on such a motion is required under Texas law, but the Juvenile Court Judge was temporarily unavailable and the court clerk returned the motion to appellees' attorney. Rather than renew the motion or appeal the emergency order, appellees filed a petition for a writ of habeas corpus in the same Harris County court.[5] A hearing on that petition was held on April 5,

[3] Tex. Fam. Code Ann., Tit. 2, § 1704 (1975):

"On a showing that the child is apparently without support and is dependent on society for protection, or that the child is in immediate danger of physical or emotional injury, the court may make any appropriate order for the care and protection of the child and may appoint a temporary managing conservator for the child."

§ 17.05 (Supp. 1978–1979):

"(a) An order issued under Section 17.04 of this code expires at the end of the 10-day period following the date of the order, on the restoration of the child to the possession of its parent, guardian, or conservator, or on the issuance of ex parte temporary orders in a suit affecting the parent-child relationship under this subtitle, whichever occurs first.

"(b) If the child is not restored to the possession of its parent, guardian, or conservator, the court shall:

"(1) order such restoration or possession; or

"(2) direct the filing of a suit affecting the parent-child relationship in the appropriate court with regard to continuing jurisdiction."

[4] § 17.06 (1975):

"On the motion of a parent, managing conservator, or guardian of the person of the child, and notice to those persons involved in the original emergency hearing, the court shall conduct a hearing and may modify any emergency order made under this chapter if found to be in the best interest of the child."

[5] Emergency orders are apparently appealable under Texas law. See § 17.07 (1975); *In re R. E. W.*, 545 S. W. 2d 573 (Tex. Civ. App. 1976).

1976, and on that date the Juvenile Court Judge concluded that venue was properly in neighboring Montgomery County, where the children were residents, and he transferred the proceedings to that county. See Tex. Fam. Code Ann., Tit. 2, § 11.04 (a) (1975). At the judge's direction, see § 17.05 (b) (2) (Supp. 1978–1979), the Department filed a "Suit Affecting the Parent-Child Relationship" as authorized by § 11.02, which was also transferred to Montgomery County. In addition, the judge issued a temporary restraining order continuing the Department's temporary custody of the children.[6]

The appellees then had actual knowledge that the action had been moved to Montgomery County.[7] There is no indication that any effort was made to expedite the hearing in that county; the appellees did not request an early hearing from state trial or appellate courts. Nor did they appeal the temporary order. See In re Stuart, 544 S. W. 2d 821 (Tex. Civ. App. 1976). Instead, on April 19, 1976, they filed this action in the United States District Court for the Southern District of Texas, and thereby initiated two months of procedural maneuvers in both the state and federal courts.

On April 20, a temporary restraining order was denied appellees by the District Court. A hearing on the application for a

---

[6] In issuing this temporary order, the Harris County Juvenile Court relied on Tex. Fam. Code Ann., Tit. 2, § 11.11 (1975 and Supp. 1978–1979), which authorizes a court in a suit affecting the parent-child relationship to make "any temporary order for the safety and welfare of the child." The parties in this litigation disagree whether the Juvenile Court Judge had jurisdiction to enter that order. This is one of a number of ambiguous state-law questions in this case. Another is the period for which such a temporary order may remain in effect.

Suits affecting the parent-child relationship are authorized by § 11.02 (1975). These suits are the vehicles by which the State brings about any change in the parent-child relationship.

[7] There is testimony in the record that a hearing had been set in Montgomery County for May 8, 1976. Defendant's Exhibit # 1A, Sworn Statement of Rex Downing 65–66.

preliminary injunction was ultimately set for May 5. When the Department received notice of the federal proceeding on April 22, the pending state proceedings were suspended.

On May 4, however, one day before the scheduled federal hearing, the Simses returned to the state-court system, moving to file an original petition for a writ of habeas corpus in the Texas Court of Civil Appeals. The motion was denied for want of jurisdiction.

The next day, the Federal District Court held that the temporary orders issued by the state court had expired and that the children had to be returned to their parents, although the Department was not enjoined from pursuing a new action in state court. The court noted that it was requesting a three-judge court to consider appellees' constitutional challenge to Title 2. On May 14, the Department did file a new § 11.02 suit in Montgomery County, and the state court issued a show-cause order and writ of attachment ordering that Paul Sims be delivered to the temporary custody of his grandparents. The court set the show-cause hearing for May 21, but the Simses could not be found for purposes of service and the hearing was reset for June 21. The Simses countered by filing in the United States District Court a second application for a temporary restraining order addressed to the Montgomery County Juvenile Court, which was granted on May 21. The three-judge court on June 7 entered a preliminary injunction enjoining the Department and other defendants from filing or prosecuting any state suit under the challenged state statutes until a final determination by the three-judge court. That determination was made on October 12, 1977, and is the subject of this appeal.

After concluding that abstention under the doctrine of *Younger* v. *Harris,* 401 U. S. 37 (1971), was unwarranted because the litigation was "multifaceted," involved custody of children, and was the product of procedural confusion in the state courts, the District Court addressed the merits of the due process challenges. It surveyed virtually every aspect of

child-abuse proceedings in Texas. *Sims* v. *State Dept. of Public Welfare,* 438 F. Supp. 1179, 1189–1195. Since we conclude that it should never have embarked on this survey we do not recount it here.

## II

Appellants argue that the Federal District Court should have abstained in this case under the principles of *Younger* v. *Harris, supra.* The *Younger* doctrine, which counsels federal-court abstention when there is a pending state proceeding, reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff. *Samuels* v. *Mackell,* 401 U. S. 66, 69 (1971). That policy was first articulated with reference to state criminal proceedings, but as we recognized in *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975), the basic concern—that threat to our federal system posed by displacement of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved. As was the case in *Huffman,* the State here was a party to the state proceedings, and the temporary removal of a child in a child-abuse context is, like the public nuisance statute involved in *Huffman,* "in aid of and closely related to criminal statutes." *Id.,* at 604. The existence of these conditions, or the presence of such other vital concerns as enforcement of contempt proceedings, *Juidice* v. *Vail,* 430 U. S. 327 (1977), or the vindication of "important state policies such as safeguarding the fiscal integrity of [public assistance] programs," *Trainor* v. *Hernandez,* 431 U. S. 434, 444 (1977), determines the applicability of *Younger-Huffman* principles as a bar to the institution of a later federal action.[8]

---

[8] Therefore, contrary to the suggestion of the dissent, we do not remotely suggest "that every pending proceeding between a State and a federal plaintiff justifies abstention unless one of the exceptions to *Younger* applies." *Post,* at 435–436.

In *Huffman,* we noted those well-established circumstances where the federal court need not stay its hand in the face of pending state proceedings.

> "*Younger,* and its civil counterpart which we apply today, do of course allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith, or where the challenged statute is ' "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." ' " 420 U. S., at 611.

The District Court, however, did not rely expressly on these established exceptions to the *Younger* doctrine in finding that abstention was inappropriate in this case. Rather, it concluded that *Younger* abstention was not warranted because the action taken by the State of Texas in this case is "multifaceted"; "there is no single state proceeding to which the plaintiffs may look for relief on constitutional or any other grounds." 438 F. Supp., at 1187.

> "Many of the challenged actions taken by the state do not and will not involve any judicial proceeding. Certainly as to these, there is no pending state civil litigation about which even to consider abstention." *Ibid.* (footnote omitted).

The court specifically alluded to the allegations regarding the Child Abuse and Neglect Report and Inquiry System (CANRIS), *id.,* at 1187 n. 5, that is, the appellees' challenge on constitutional grounds to the State's computerized collection and dissemination of child-abuse information where that information is not the product of a judicial determination of abuse or neglect.

The meaning of the District Court's reference to this litigation as "multifaceted" is unclear, but two possible interpreta-

tions suggest themselves. Under established principles of equity, the exercise of equitable powers is inappropriate if there is an adequate remedy at law. See *Douglas* v. *City of Jeannette,* 319 U. S. 157, 164 (1943). Restated in the abstention context, the federal court should not exert jurisdiction if the plaintiffs "had an *opportunity* to present their federal claims in the state proceedings." *Juidice* v. *Vail, supra,* at 337 (emphasis in original); see *Gibson* v. *Berryhill,* 411 U. S. 564, 577 (1973). The pertinent issue is whether appellees' constitutional claims could have been raised in the pending state proceedings. The District Court's reference to the child-abuse reporting system reflects a misunderstanding of the nature of the inquiry. That the Department's suit does not necessarily implicate CANRIS is not determinative. The question is whether that challenge can be raised in the pending state proceedings subject to conventional limits on justiciability. On this point, Texas law is apparently as accommodating as the federal forum.[9] Certainly, abstention is appro-

---

[9] Section 11.02 (b) of Title 2 provides:

"(b) One or more matters covered by this subtitle may be determined in the suit. The court, on its own motion, may require the parties to replead in order that any issue affecting the parent-child relationship may be determined in the suit." Tex. Fam. Code Ann., Tit. 2, § 11.02 (b) (1975).

As one Texas commentator has noted, § 11.02 (b) vests "a broad range of powers and duties on district courts in cases in which minors appear before the court." Smith, Draftmen's Commentary to Title 2 of the Texas Family Code, 5 Tex. Tech. L. Rev. 389, 393 (1974). He notes that this section adopts the liberal approach to joinder of claims and remedies found in Tex. Rule Civ. Proc. 51. Section 11.14, which describes the hearing in suits affecting the parent-child relationship, fortifies that view. It states: "(a) Except as otherwise provided in this subtitle, proceedings shall be as in civil cases generally."

Texas Rule Civ. Proc. 51 is modeled on Fed. Rule Civ. Proc. 18 and provides in relevant part that "[t]he plaintiff in his petition or in a reply setting forth a counterclaim and the defendant in an answer setting forth a counterclaim may join either as independent or as alternate claims as

priate unless state law clearly bars the interposition of the constitutional claims.

There are also intimations in the District Court's opinion that its decision to exert jurisdiction was influenced by a broader and novel consideration—the breadth of appellees' challenge to Title 2.

> "The entire statutory scheme by which Texas attempts to deal with the problem of child abuse has been challenged and should be viewed as an integrated whole. This court will not consider part of the scheme and abstain from another part. To do so would seriously jeopardize any hope for an effective statutory scheme and, in the name of comity and federalism, do violence to the state functions those principles seek to protect." 438 F. Supp., at 1187.[10]

---

many claims either legal or equitable or both as he may have against an opposing party." Thus, Texas procedural law has long encouraged joinder of claims in civil actions. See, e. g., *Texas Gauze Mills* v. *Goatley*, 119 S. W. 2d 887, 888 (Tex. Civ. App. 1938); *Blair* v. *Gay*, 33 Tex. 157, 165 (1870).

In a very recent case, *In re R. E. W.*, 545 S. W. 2d 573 (1976), the Texas Court of Civil Appeals has indicated that under Title 2 the full range of constitutional challenges is cognizable in the emergency-removal proceedings and in suits affecting the parent-child relationship. *Id.*, at 575. Therefore, this is not a case like *Hernandez* v. *Finley*, 471 F. Supp. 516 (ND Ill. 1978), summarily aff'd *sub nom. Quern* v. *Hernandez*, 440 U. S. 951 (1979), where the three-judge court found, after our remand in *Trainor* v. *Hernandez*, 431 U. S. 434 (1977), that the applicable state procedures did not permit the defendant to raise a constitutional challenge.

[10] Thus, we cannot agree with the dissenters' characterization of the claims raised below as being as unrelated as child abuse and traffic violations. As the District Court properly perceived it, this action is a comprehensive attack on an integrated statutory structure best suited to resolution in one forum. Our disagreement with the District Court is with its choice of forum. Likewise, there is little in our case law or sound judicial administration to commend the suggestion that *Younger* should have been invoked with respect to some of the claims in this case and

Thus, the District Court suggests that the more sweeping the challenge the more inappropriate is abstention, and thereby inverts traditional abstention reasoning. The breadth of a challenge to a complex state statutory scheme has traditionally militated in *favor* of abstention, not *against* it. This is evident in a number of distinct but related lines of abstention cases which, although articulated in different ways, reflect the same sensitivity to the primacy of the State in the interpretation of its own laws and the·cost to our federal system of government inherent in federal-court interpretation and subsequent invalidation of parts of an integrated statutory framework.

The earliest abstention cases were rooted in notions of equity. In *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496, 498 (1941), the Court observed that the dispute before it implicated "a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." The Court found the "resources of equity" sufficient to accommodate an adjustment which would avoid "the friction of a premature constitutional adjudication" and obviate the need for a federal court to interpret state law without the benefit of an authoritative interpretation by a state court. *Id.*, at 500. Thus evolved the doctrine of *Pullman* abstention: that a federal action should be stayed pending determination in state court of state-law issues central to

others should have been left to the federal forum. *Post,* at 443. Given the interrelated nature of the claims, such a bifurcation would result in the duplicative litigation and lack of state-court interpretation of an integrated statutory framework that this Court, in *Trainor* v. *Hernandez, supra,* at 445, identified as central concerns underlying the *Younger* doctrine.

The dissenters' additional argument that a constitutional attack on state procedures automatically vitiates the adequacy of those procedures for purposes of the *Younger-Huffman* line of cases is reiteration of a theme sounded and rejected in prior cases. See *Trainor* v. *Hernandez, supra,* at 469–470 (STEVENS, J., dissenting); *Juidice* v. *Vail,* 430 U. S. 327, 339–340 (1977) (STEVENS, J., concurring in judgment).

the constitutional dispute. Mr. Justice Frankfurter in his opinion for the Court observed:

> "The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. There have been as many and as variegated applications of this supple principle as the situations that have brought it into play. . . . Few public interests have a higher claim on the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, *Fenner* v. *Boykin,* 271 U. S. 240; *Spielman Motor Co.* v. *Dodge,* 295 U. S. 89; or the administration of a specialized scheme for liquidating embarrassed business enterprises, *Pennsylvania* v. *Williams,* 294 U. S. 176; or the final authority of a state court to interpret doubtful regulatory laws of the state, *Gilchrist* v. *Interborough Co.,* 279 U. S. 159 . . . ." *Ibid.*

There are three distinct considerations that counsel abstention when broad-based challenges are made to state statutes, and it is common to see each figure in an abstention decision; for the broader the challenge, the more evident each consideration becomes. There is first the *Pullman* concern: that a federal court will be forced to interpret state law without the benefit of state-court consideration and therefore under circumstances where a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time—thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless. *Watson* v. *Buck,* 313 U. S. 387, 401–402 (1941); and *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 459–461 (1945). These dangers increase with the breadth of the challenge.

The second consideration is the need for a concrete case or controversy—a concern also obviously enhanced by the scope of the challenge. That is demonstrated by the instant case.

For example, appellees challenge § 11.15 of the Texas Family Code which provides that the standard of proof in any suit affecting the parent-child relationship shall be the "preponderance of the evidence." The District Court held that in any proceeding involving parental rights, the State must bear as a matter of federal constitutional law a burden of "clear and convincing" evidence. Yet no proceeding was pursued in this case to the point where the standard could be applied, and consequently appellees can point to no injury in fact. A second illustration is the challenge to statutorily authorized pre-seizure investigative procedures: there was apparently no preseizure investigation in this case.[11] *Alabama State Federation of Labor* v. *McAdory, supra,* at 461; *Public Service Comm'n* v. *Wycoff Co.,* 344 U. S. 237, 245–246 (1952).

The final concern prompted by broad facial attacks on state statutes is the threat to our federal system of government posed by "the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes." *Alabama State Federation of Labor* v. *McAdory, supra,* at 471.

> "The seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence." *Huffman* v. *Pursue, Ltd.,* 420 U. S., at 603.

State courts are the principal expositors of state law. Almost every constitutional challenge—and particularly one as far ranging as that involved in this case—offers the opportunity for narrowing constructions that might obviate the constitu-

---

[11] The District Court focused on psychiatric examinations, although there is no evidence that there was any examination of this nature administered to the Sims children before or after the temporary removal. *Sims* v. *State Dept. of Public Welfare,* 438 F. Supp. 1179, 1191.

tional problem and intelligently mediate federal constitutional concerns and state interests. When federal courts disrupt that process of mediation while interjecting themselves in such disputes, they prevent the informed evolution of state policy by state tribunals. *Trainor* v. *Hernandez,* 431 U. S., at 445. The price exacted in terms of comity would only be outweighed if state courts were not competent to adjudicate federal constitutional claims—a postulate we have repeatedly and emphatically rejected. *Huffman, supra,* at 610–611.

In sum, the only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims, and Texas law appears to raise no procedural barriers.[12] Nor do appellees seriously argue to the contrary. Rather, they contend that because they were not granted a hearing at the time that they thought they were entitled to one, there was no practical opportunity to present their federal claims.[13] Thus, the issue as posed by appellees is whether the

---

[12] The proposition that claims must be cognizable "as a defense" in the ongoing state proceeding, as put forward by our dissenting Brethren, *post,* at 436–437, converts a doctrine with substantive content into a mere semantical joust. There is no magic in the term "defense" when used in connection with the *Younger* doctrine if the word "defense" is intended to be used as a term of art. We do not here deal with the long-past niceties which distinguished among "defense," "counterclaims," "setoffs," "recoupments," and the like. As we stated in *Juidice* v. *Vail,* 430 U. S., at 337:

"Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings. No more is required to invoke *Younger* abstention. . . . Appellees need be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings . . . and their failure to avail themselves of such opportunities does not mean that the state procedures were inadequate." (Footnotes omitted; emphasis in original.)

[13] In their brief, appellees argue that there was no adequate remedy at state law because their "every effort, to obtain judicial relief in State court was either frustrated or denied." Brief for Appellees 25. During oral argument, counsel for appellees responded to a request for justification of federal-court involvement in this case by stating that appellees did not

conduct of the state judiciary was such that it in fact denied appellees an opportunity to be heard that was theirs in theory. That claim is related to the District Court's second theory why *Younger* abstention was not warranted in this case.

The District Court framed this "second independent basis for the inapplicability of *Younger* principles" as follows:

> "[W]e note that the plaintiffs' constitutional challenge is directed primarily at the legality of the children's seizure and detention for a 42-day period without a hearing. It is clear that because this issue cannot be raised as a defense in the normal course of the pending judicial proceeding, abstention would be inappropriate. *See Gerstein* v. *Pugh,* 420 U. S. 103, 108 n. 9 . . . (1975). The denial of custody of the children pending any hearing regardless of the result of the hearing, is in itself sufficient to prevent the application of *Younger*." 438 F. Supp., at 1187.

The reliance on *Gerstein* is misplaced. That case involved a challenge to pretrial restraint on the basis of a prosecutor's information alone, without the benefit of a determination of probable cause by a judicial officer. This Court held that the District Court properly found that the action was not barred by *Younger* because the injunction was not addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves. "The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." *Gerstein* v. *Pugh,* 420 U. S. 103, 108 n. 9 (1975). Here the injunction did address the state proceeding and it was not necessary to obtain the release of the children, for they had already been placed in the custody of their parents pursuant to a federal-court order. This Court has addressed the *Younger* doctrine on a number of occasions since

---

believe that there was a state action pending below. Tr. of Oral Arg. 34. Counsel did not argue that the perceived deficiency in the state proceedings was the product of a procedural bar to appellees' constitutional claims.

*Gerstein.* In *Juidice* v. *Vail,* 430 U. S., at 336–337, we noted that the teaching of *Gerstein* was that the federal plaintiff must have an opportunity to press his claim in the state courts and, as noted above, the appellees have not shown that state procedural law barred presentation of their claims—in fact Texas law seems clearly to the contrary.

As for the argument that the delay in affording the parents a hearing in state court made *Younger* abstention inappropriate, we cannot distinguish this argument from conventional claims of bad faith and other sources of great, immediate, and irreparable harm if the federal court does not intervene—traditional circumstances where a federal court need not stay its hand. We simply cannot agree that the conduct of the state authorities in this case evinces bad faith; and we do not read the District Court as expressly so finding. That there was confusion is undeniable. It is evident in the uncertainty regarding the effective period of a temporary order under § 11.11 and regarding the propriety of entering that order when venue was in Montgomery County. But confusion is not bad faith, and in this case confusion was the predictable byproduct of a new statutory scheme. The question would be a much closer one had appellees diligently sought a hearing in Montgomery County after the Harris County action was transferred or had they pursued their appellate remedies.

Once it is determined that there is no bad faith, there remain only limited grounds for not applying *Younger.* The District Court did not find, nor could it have found, "harassment." Nor could it credibly be claimed that Title 2 is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Watson* v. *Buck,* 313 U. S., at 402, quoted in *Younger* v. *Harris,* 401 U. S., at 53–54.

The District Court placed some reliance on the observation in *Younger* that there may be other "extraordinary circum-

stances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." *Id.*, at 53. See *Perez* v. *Ledesma,* 401 U. S. 82, 85 (1971); *Mitchum* v. *Foster,* 407 U. S. 225, 230–231 (1972). The most extensive explanation of those "extraordinary circumstances" that might constitute great, immediate, and irreparable harm is that in *Kugler* v. *Helfant,* 421 U. S. 117 (1975). Although its discussion is with reference to state criminal proceedings, it is fully applicable in this context as well.

> "Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of 'extraordinary circumstances,' of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. But whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Id.*, at 124–125.

See *Trainor* v. *Hernandez,* 431 U. S., at 442 n. 7.

To gauge whether such extraordinary circumstances exist in this case, we must view the situation at the time the state proceedings were enjoined. On May 21, when the District Court granted a temporary restraining order, and on June 7, when the three-judge court entered a preliminary injunction enjoining appellants from filing or prosecuting any state suit under the challenged state statutes until the District Court had finally determined the questions at issue, the two adult appellees had already successfully obtained possession of their minor children by means of the federal-court order of

May 5. The District Court's order of that date did not enjoin the Department from instituting a new suit in state court, and such a suit was instituted in Montgomery County on May 14. The Montgomery County action was entitled a "Suit Affecting the Parent-Child Relationship," and the Department's petition related the documented child abuse and prayed that a writ of attachment issue to protect the minor child, Paul Sims. The state court issued a writ pursuant to § 11.11 directing that Paul Sims be placed in the temporary custody of his grandparents, appointing a guardian *ad litem,* and setting a hearing to show cause for May 21. The record indicates that appellees absented themselves from home, work, and school, thereby impeding the attachment and service of the show-cause order, and does not indicate that the actual physical custody of Paul Sims was ever surrendered by appellees pursuant to the Montgomery County court writ.

It is in this posture that one must consider the propriety of the District Court's injunction barring further state proceedings. Paul Sims was within the custody of his parents, and a specific date had been set for the show-cause hearing regarding the writ of attachment, at which time the parents could press their objections. Unless we were to hold that every attachment issued to protect a child creates great, immediate, and irreparable harm warranting federal-court intervention, we are hard pressed to conclude that with the state proceedings in this posture federal intervention was warranted.

Perhaps anticipating this logic, the District Court in this case concluded that "[t]he denial of custody of the children pending any hearing regardless of the result of the hearing, is in itself sufficient to prevent the application of *Younger,*" 438 F. Supp., at 1187. Presumably, this conclusion was prompted by the District Court's observation that "the constitutional issues raised by the plaintiffs reach the application of due process in an area of the greatest importance to our society, the family." *Ibid.* But the District Court again inverts

traditional abstention logic when it states that because the interests involved are important, abstention is inappropriate. Family relations are a traditional area of state concern. This was recognized by the District Court when it noted the "compelling state interest in quickly and effectively removing the victims of child abuse from their parents." *Id.*, at 1189. We are unwilling to conclude that state processes are unequal to the task of accommodating the various interests and deciding the constitutional questions that may arise in child-welfare litigation.[14]

We reverse the judgment of the District Court and remand with instructions that the complaint be dismissed.

*It is so ordered.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL join, dissenting.

Before asking whether any of the recognized exceptions to the doctrine of *Younger* v. *Harris,* 401 U. S. 37, make it appropriate for a federal court to exercise its jurisdiction to pass on the constitutionality of a state statute, the Court should first decide whether there is a legitimate basis for invoking the *Younger* doctrine at all. It has never been suggested that every pending proceeding between a State and a federal plaintiff justifies abstention unless one of the exceptions to *Younger*

---

[14] The dissenters' concern that requiring appellees to raise their challenges to the Texas Family Code in the pending proceeding will complicate and delay resolution of the merits of the State's claims would clearly be misplaced if the dissent were correct in its characterization of the bulk of appellees' claims as analogous to "a traffic violation" as far as their relation to the pending state proceeding is concerned. Appellees could simply obtain a resolution of the pending proceeding and then file their separate action. They are certainly not required to pursue "an unwise and impractical course of litigation." *Post,* at 440. Nor is there reason to believe that consolidating all of these claims in federal court or litigating simultaneously in two different courts would prove more expeditious, wise, or practical.

applies; for example, a pending charge that the federal plaintiff is guilty of a traffic violation will not justify dismissal of a federal attack on the constitutionality of the State's child-abuse legislation.

The policy of equitable restraint expressed in *Younger* "is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler* v. *Helfant,* 421 U. S. 117, 124. Since "no citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts," *Younger* v. *Harris, supra,* at 46, there is no justification for intervention by a court of equity to rule on claims which may be raised as a defense to the criminal prosecution and which, if meritorious, will result in adequate relief in that forum. Moreover, in our federal system, intervention by a federal court with respect to the questions at issue in state proceedings carries with it additional costs in terms of comity and federalism, for it "can readily be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 604.

The District Court's conclusion that abstention was inappropriate in this case was based squarely on its finding "that there is for these plaintiffs no 'opportunity to fairly pursue their constitutional claims in an ongoing state proceeding.' " [1] In the absence of such an opportunity, *Younger* is simply inapplicable. Its underlying concerns with comity, equity, and federalism, we have recognized, have little force or vitality where there is no single pending state proceeding in which the constitutional claims may be raised "as a defense" and

---

[1] *Sims* v. *State Dept. of Public Welfare,* 438 F. Supp. 1179, 1189, quoting *Juidice* v. *Vail,* 430 U. S. 327, 338. A comparable finding by the District Court following this Court's remand in *Trainor* v. *Hernandez,* 431 U. S. 434, led to our unanimous summary affirmance of a holding that *Younger* v. *Harris* did not justify abstention. See *Quern* v. *Hernandez,* 440 U. S. 951.

effective relief secured.[2] "When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." *Steffel* v. *Thompson,* 415 U. S. 452, 462. To be sure, it can be argued that whenever a federal court rules on the constitutionality of a state statute, it is making a decision that interferes with the operation of important state mechanisms, and performing a task that could equally be performed by a state court. See *ante,* at 427. But this sort of lesser affront to principles of comity and federalism is not one that justifies a federal court in refusing to exercise the jurisdiction over federal claims that Congress has entrusted to it. As this Court has repeatedly held, if a constitutional violation is alleged, even with respect to the most important state statute, a plaintiff is free to bring his suit in federal court without any requirement that he first exhaust state judicial remedies.[3]

In requiring abstention in this case, the Court, in my judgment, is departing from these well-established principles and extending *Younger* beyond its logical bounds. The Sims parents sought relief in federal court after 42 days of "diligent efforts" to secure a hearing in state court in order to regain custody of their children.[4] Despite their efforts, they not only

---

[2] See *Steffel* v. *Thompson,* 415 U. S. 452, 462–463; *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 509. See also *Younger* v. *Harris,* 401 U. S., at 46 ("the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution").

[3] See *Monroe* v. *Pape,* 365 U. S. 167, 183; *Steffel* v. *Thompson, supra.* See also *Mitchum* v. *Foster,* 407 U. S. 225; *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 U. S. 278.

[4] "The plaintiffs' having sought through diligent efforts an opportunity to be heard in a state proceeding, this court must conclude that whatever opportunities exist for them are not such as to allow them to 'fairly pursue' their constitutional objections." 438 F. Supp., at 1188–1189.

failed to regain custody, but also did not even have an opportunity to be heard in a state court. Their constitutional challenge in federal court was "directed primarily at the legality of the children's seizure and detention for a 42-day period without a hearing" and the statutory scheme which allowed this serious deprivation of liberty to occur.[5]

The only proceeding pending in state court at the time they brought this suit was a "Suit Affecting the Parent-Child Relationship" initiated by the Harris County Welfare Unit on April 5 pursuant to ch. 11 of the Texas Family Code.[6] As of the first hearing in federal court on May 5, the plaintiff-parents had yet to receive notice of this suit, let alone any actual hearing before the judge. Had the federal court not intervened, however, notice would eventually have been provided, assuming compliance with the statute, and an adversary hearing would eventually have taken place. But this does not mean that federal-court abstention was required or appropriate.

In the hearing to be afforded under ch. 11, the state court would be required to decide whether the children should be returned to the custody of their parents or whether their interests would be better served by alternative arrangements for their care. With limited exceptions,[7] the Simses' suit in

---

[5] *Id.*, at 1187.

[6] *Id.*, at 1185. These proceedings were suspended, apparently voluntarily, by the State on April 22, when the Department of Human Resources received notice of the federal suit. A second ch. 11 suit was later filed by the Department, with respect to Paul Sims alone, on May 14, after suit in federal court had been filed and the first hearing held. Whether that action could in any circumstances serve as a predicate for a *Younger* dismissal is a substantial question which the Court does not purport to address. See *Hicks* v. *Miranda,* 422 U. S. 332.

[7] In addition to their challenges to the practices and procedures afforded by the State prior to a final adversary hearing, the Simses also claimed that an attorney *ad litem* should be appointed for a child in any suit affecting the parent-child relationship and that, where the State sought conservatorship of a child or termination of the parent-child relationship, it should

federal court had nothing to do with that question. The issues raised by their federal complaint did not go to their fitness as parents or to their rights to permanent custody of their children. Rather, the thrust of their federal complaint was that the procedures employed by the State to gather information and to seize and retain the children pending the formal adversary hearing under ch. 11 violated the Constitution.[8]

As to these constitutional claims, the hearing to be afforded in state court on parental fitness and permanent custody was virtually as irrelevant as a hearing on a traffic violation. It is clearly the case, and the majority does not suggest otherwise, that the Simses could not avoid losing custody of their children at that point by successfully arguing that the State had acted unconstitutionally in its initial seizure of the children, or that a hearing should have been afforded earlier. These claims could not be raised "as a defense to the ongoing proceedings," *Juidice* v. *Vail,* 430 U. S. 327, 330; [9] nothing in the ch. 11 determinations required the court to consider or pass upon the different issues that the Simses sought to raise in federal court.

It may well be, as the majority suggests, that the Simses could have raised their constitutional claims against the State, not in defense, but in the nature of permissive counterclaims. The findings of the District Court, however, suggest the contrary.[10] But even if Texas does allow a party to raise any and

---

be required to prove its case by clear and convincing evidence. The second claim relates only to the rules governing the formal ch. 11 hearing; the first to that hearing as well as prior hearings which they claimed were required.

[8] See 438 F. Supp., at 1187.

[9] "[T]he plaintiffs' constitutional challenge is directed primarily at the legality of the children's seizure and detention for a 42-day period without a hearing. It is clear that because this issue cannot be raised as a defense in the normal course of the pending judicial proceeding, abstention would be inappropriate." *Ibid.*

[10] "[T]here is no single state proceeding to which the plaintiffs may look for relief on constitutional or any other grounds." *Ibid.*

all claims against the other party—no matter how unrelated—in a single proceeding, it certainly does not mandate that he do so. Broadening the scope of the state litigation to encompass new and difficult issues could only complicate and delay the Simses' efforts to obtain a hearing on the merits of the State's complaint as promptly as possible. In the meantime, of course, custody of the children would remain with the State and the deprivation of the parents' interests in the integrity of the family unit would continue.

The *Younger* doctrine does not require a litigant to pursue such an unwise and impractical course of litigation. *Younger* does not bar federal-court consideration of "an issue that could not be raised in defense of the criminal prosecution." *Gerstein* v. *Pugh,* 420 U. S. 103, 108 n. 9.[11] The considerations of comity, equity, and federalism underlying that doctrine are no more implicated by the *Sims* decision that claims unrelated to a pending state proceeding should be brought in federal rather than state court than they are by a similar decision in the absence of an unrelated state proceeding. If there is no requirement that federal plaintiffs initiate constitutional litigation in state rather than federal court in the first instance—and this Court has repeatedly held that there is not[12]—then the coincidence of an unrelated state proceeding provides no justification for imposing such a requirement.

While this factor alone is sufficient to render the *Younger* doctrine inapplicable, there is an even more basic objection to its application here. *Younger* abstention in these circumstances does not merely deprive the plaintiffs of their right to initiate new claims in the forum of their choice. Far more seriously, it deprives them of any relief at all. For this state forum could not and did not afford plaintiffs the sufficient op-

---

[11] See also *Fuentes* v. *Shevin,* 407 U. S. 67. See generally Developments in the Law—Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1318–1319 (1977).

[12] See n. 3, *supra.*

portunity to vindicate their constitutional rights that is not only a predicate to a *Younger* dismissal, but also their entitlement under the Constitution.

The three Sims children were taken into custody by the Harris County Child Welfare Unit on March 25, 1976, based on a telephone report that one of the children was possibly the victim of child abuse. After "diligent" but unsuccessful efforts by the parents to be heard in state court, they finally went to federal court where, 42 days after they lost custody of their children, the Simses were heard for the first time in a court of law and their children were returned to them.[13] In due course, the federal court held that the state statutory procedures were defective because they did not provide for adequate notice to the parents, and did not provide for an adequate hearing whenever the State sought to retain custody for more than 10 days. Although other portions of the District Court decision as to the State's procedures are challenged by the appeal in this Court, the appellants have not questioned these aspects of the District Court's judgment.[14] It is there-

---

[13] The majority does not address separately the question of the federal court's authority to order the children returned to custody of their parents pending the final state hearing. Since that order did not resolve the merits of any issue to be decided in the state proceeding under ch. 11, I see no basis for distinguishing that decision from the District Court's underlying holdings that the statutory scheme pursuant to which the children were seized and detained by the State is unconstitutional.

[14] Specifically, the appellants do not challenge the validity of paragraphs 2, 5, 6, 7, and 8 of the judgment entered by the District Court; these paragraphs read as follows:

"2. That the use of Section 11.11 (a) (4) in conjunction with Chapter 17 of Title 2 of the Texas Family Code to deprive parents of the custody of children for longer than ten (10) days measured from the date of the deprivation, without a full adversary hearing, is an unconstitutional application of said provision.

"5. That Section 17.03 is unconstitutional on its face insofar as it fails to require the State to make all reasonable efforts to serve notice on the

fore undisputed that the Texas procedures did not afford the parents a fair opportunity to vindicate their rights.

"[T]he opportunity to raise and have timely decided by a competent state tribunal the federal issues involved,"[15] is, of course, required to support a *Younger* dismissal. And in the circumstances of this case, it is also—concededly—required by the Due Process Clause. Here, such an opportunity was simply not available in the state-court system; the opportunity

---

parents of the ex parte hearing to be held immediately after possession of a child is taken by the State.

"6. That Section 17.05 is unconstitutional on its face insofar as it fails to require the State to hold a full adversary hearing with adequate notice to the parents before possession of a child taken by the State can be retained by the State beyond ten (10) days.

"7. That Section 17.06 is unconstitutional on its face insofar as it fails to require the State to hold a full adversary hearing at the expiration of the ex parte order, if the State seeks to obtain an order to retain possession of the child beyond ten (10) days.

"8. That Section 34.05 (c) is unconstitutional on its face insofar as it fails to require notice to the parents and a hearing in which the State makes a showing that a court order allowing psychological or psychiatric examinations is necessary to aid in the investigation of the abuse or neglect before such an order is obtained." App. A–102—A–103.

[15] *Gibson* v. *Berryhill*, 411 U. S. 564, 577. In *Gibson*, the Court concluded that this predicate to a *Younger* dismissal was not present because of the District Court's conclusion—on the merits of the plaintiffs' challenge—that the State Board was incompetent to adjudicate the issues pending before it. The critical point was that "the administrative body itself was unconstitutionally constituted, and so not entitled to hear the charges filed against the appellees." 411 U. S., at 577. The case before us is analogous: if the District Court here is correct—and the State accepts that it is, at least in part—that the procedures afforded by the State after its seizure of the children fail to comport with the minimum requirements of due process, then there is no more reason to abstain in favor of an unconstitutionally limited opportunity than in favor of the unconstitutionally composed Board in *Gibson*. The availability of a later full hearing in state court does not cure the problem in either case. As the Court recognized in *Gibson*, a subsequent *de novo* hearing cannot undo the interim harm to constitutional rights. *Id.*, at 577 n. 16. See also *Juidice* v. *Vail*, 430 U. S., at 340–341 (STEVENS, J., concurring in judgment).

to be heard at a later ch. 11 hearing is, as the State accepts, too late to meet the requirements of due process and to afford relief as to the interim deprivation. By ordering abstention nonetheless, the majority is not only extending the *Younger* doctrine beyond its underlying premise, but is also implicitly sanctioning a deprivation of parental rights without procedural protections which, as the State itself agrees, are constitutionally required.[16]

In my judgment, there could be no serious criticism of a holding that the *Younger* doctrine could properly be invoked in this case to bar consideration of the limited and easily divisible aspects of the Simses' challenge which were directed at the procedures to be followed in the ch. 11 adversary hearing.[17] That hearing would afford the parents "a fair and sufficient opportunity" to raise those claims, and there is no reason why the State should not have been able, if it wished, to go forward with an adversary hearing in the April 5 suit. Were the Court's decision today so limited, it would be supported by its prior cases. But in going further and holding that the federal court should have abstained as to the legality of the State's prehearing procedures and practices, the Court is applying the *Younger* doctrine where it simply does not belong. The District Court's finding that plaintiffs did not have a fair opportunity to pursue these constitutional claims in an ongoing state proceeding is amply supported by the record and the concessions of the State. This finding should foreclose any claim that the *Younger* doctrine makes abstention appropriate. I respectfully dissent.

---

· [16] In some sense, every *Younger* dismissal involves an implicit constitutional decision that remitting the federal plaintiff to defend in the state forum is not itself a deprivation of his constitutional rights. In *Younger* itself, the Court was careful to point out that "[n]o citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts." 401 U. S., at 46. The same cannot be said about the extended deprivation of custody of one's children without any form of notice or hearing.

[17] See n. 6, *supra*.