**R. Eugene PINCHAM, Plaintiff–Appellant,**

v.

**The ILLINOIS JUDICIAL INQUIRY BOARD and Its Members, et al., Defendants–Appellees.**

No. 88–1592.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1988.

Decided April 27, 1989.

Rehearing and Rehearing In Banc Denied May 22, 1989.

**1342**

Sam Adam, Robert E. Pincham, Jr., Ltd., Chicago, Ill., for plaintiff-appellant.

Dan K. Webb, Winston & Strawn, Chicago, Ill., for defendants-appellees.

Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Justice R. Eugene Pincham appeals the district court's order dismissing a civil rights action Justice Pincham brought against the Illinois Judicial Inquiry Board, the Illinois Courts Commission and the members of both bodies under 42 U.S.C. § 1983. Justice Pincham claimed that ongoing proceedings in the Judicial Inquiry Board and the Courts Commission would deprive him of rights guaranteed under the First and Fourteenth Amendments of the United States Constitution. The district court's dismissal of Pincham's case rested upon the principles of federalism and comity the United States Supreme Court enunciated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). We affirm.

## I.

### *Facts*

This case arises from a speech Justice R. Eugene Pincham of the Illinois Appellate Court, First District delivered on January 31, 1987. The plaintiff-appellant's speech was given at an Operation P.U.S.H. Saturday Forum and, in the words of Pincham's First Amended Complaint, was "an unwritten contemporaneous speech commemorating Black History in America, celebrated during February–Black History Month." First Amended Complaint at ¶ 17. During Justice Pincham's speech, dealing with themes of racial unity and solidarity, he referred to a number of blacks and whites who were hanged in a 1741 New York slave rebellion and stated that "we are here on the shoulders" of those who died in that rebellion. In the last part of the speech Justice Pincham applied this theme to black candidates involved in mayoral races across the country, stating that "the black leaders are our candidates and they ride on our shoulders." After enumerating a list of these candidates, he focussed on the Chicago mayoral election, stating:

"Harold Washington is running for mayor of the City of Chicago. And he got here on our shoulders. You've got to

decide here and now whether or not your shoulders are broad enough to carry him in another time.

\* \* \* \* \* \*

And those of us who might be inclined to be traitors—you see, there is some who have slave mentalities—those of us who are inclined to be traitors who suspect that because you going to the secrecy of a voting booth that you can vote for who you want to vote for, we know who you are. And be not confused about it. When the ballot comes out, we going to count. And 100 percent. Not 99 percent of the votes cast. Not 90 percent of the votes cast. *Any man south of Madison Street who casts a vote in the February 24th election who doesn't cast a vote for Harold Washington ought to be hung as those were hung in New York.*

\* \* \* \* \* \*

He rides on our shoulders and the movement. You see, we're not talking about an election. We're talking about a crusade. We're talking about a movement. We're talking about an emancipation. We're talking about lifting the mentality of—the slave mentality—of those who still have it."

(Emphasis added).

On February 23, 1987, the plaintiff-appellant received a letter from Robert B. Cummins, Chairman of the Illinois Judicial Inquiry Board, enclosing a copy of the speech and stating that:

"The Judicial Inquiry Board proposes charges that your participation in and remarks at the January 31 Forum constitute political activity in violation of Supreme Court Rule 62, Rule 67(2) and (4) and the introductory paragraph to Rule 61.[1]

\* \* \* \* \* \*

It is charged that your conduct in this regard constitutes willful misconduct in office and conduct that is prejudicial to the administration of justice and brings the judicial office into disrepute, in violation of Article VI, Section 15 of the Illinois Constitution." [2]

The letter also stated that prior to the Judicial Inquiry Board's determination of whether there was a reasonable basis to file a complaint against Justice Pincham with the Courts Commission, he was directed to appear and respond to the charges on March 13, 1987 at the Board's Chicago office.

Article VI of the Illinois Constitution creates the Judicial Inquiry Board and the Courts Commission and provides these agencies with the authority to resolve judicial disciplinary matters. The Judicial Inquiry Board is composed of two circuit judges, appointed by the Supreme Court, together with the governor's seven appointees, four non-lawyers, and three lawyers. Illinois Constitution, Art. VI, Sec. 15(b). After a finding of reasonable cause to believe that the conduct complained of is violative of Supreme Court rules is reached by five members of the Judicial Inquiry Board, a complaint can be filed with the Courts Commission. The Courts Commission consists of a justice of the Supreme Court, two

---

1. The introductory paragraph of Supreme Court Rule 61 provides:

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should himself observe, high standards of conduct so that integrity and independence of the Judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective."

Supreme Court Rule 62(A) states:

"A judge should respect and comply with the law and should conduct himself at all times in the manner that promotes public confidence in the integrity and impartiality of the judiciary."

Supreme Court Rule 67(A)(2) provides:

"A judge may not, except when a candidate for office or retention, participate in political campaigns or activities, or make political contributions."

Supreme Court Rule 67(A)(4) states:

"A judge should not engage in any other political activity except on behalf of measures to improve the law, the legal system or the administration of justice."

2. Article VI, Section 15 of the Illinois Constitution establishes the Judicial Inquiry Board and the Courts Commission and provides them with the authority to discipline judges for the reasons including those set forth in the last paragraph of the quotation.

justices of the Appellate Court and two Circuit Court judges. Concurrence of three members of the Courts Commission is required before disciplinary measures may be imposed upon a judge. The Illinois Supreme Court described the responsibilities of these respective bodies in the following manner:

"The Courts Commission is the adjudicatory arm of the system of judicial discipline established by article VI, section 15, of our constitution. Section 15(e) vests the Commission with the authority to hear and determine complaints filed against judges by the Judicial Inquiry Board, which is the investigatory and charging arm of the disciplinary system and with the authority to impose sanctions for 'willful misconduct in office, persistent failure to perform [their] duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute.' (Ill. Const.1970, art. VI, sec. 15(e).)"

*People ex rel. Judicial Inquiry Board v. Courts Commission,* 91 Ill.2d 130, 61 Ill. Dec. 789, 791, 435 N.E.2d 486, 488 (1982) (citation omitted).

The decision of the Courts Commission in judicial disciplinary matters is final and a direct appeal of the Courts Commission decision through the Illinois court system is not provided within the statutes. Nonetheless, a party may commence indirect review of certain orders of the Courts Commission by requesting the courts to invoke their jurisdiction to issue writs of mandamus in cases where the Courts Commission has allegedly exceeded its constitutionally delegated authority, such as when the

Courts Commission authoritively construes state statutes (rather than the Supreme Court rules it is responsible for enforcing). *See Harrod v. Illinois Courts Commission,* 69 Ill.2d 445, 14 Ill.Dec. 248 at 260–61, 372 N.E.2d 53 at 65–66 (1977).

On March 13, 1987, the plaintiff-appellant appeared before the Judicial Inquiry Board, with counsel, and argued that his January 31 speech did not violate Supreme Court Rules 61, 62, 67(A)(2) and 67(A)(4). Further, Justice Pincham contended that if the rules were construed to prohibit his speech they would be in violation of his right to free speech and his right to be free from vague restrictions on speech guaranteed under the First and Fourteenth Amendments to the United States Constitution. He urged that the Judicial Inquiry Board would thus be acting without a reasonable basis were it to file a complaint with the Courts Commission challenging his speech. Justice Pincham submitted a written memorandum of authorities to the Judicial Inquiry Board in support of his position.

In June 1987, the Justice filed an action in the district court seeking to enjoin the Judicial Inquiry Board and the Courts Commission from "filing or proceeding upon any Complaint against [Justice Pincham] premised upon [Pincham's] January 31, 1987 Operation PUSH speech."[3] Justice Pincham alleged that the Judicial Inquiry Board "intends to and will file a complaint with the ... Courts Commission against [Justice Pincham] because of [Pincham's] PUSH speech which the ... Judicial Inquiry Board will contend violated ... Illinois Supreme Court rules."[4]

The Judicial Inquiry Board and Courts Commission moved to dismiss Justice Pinc-

**3.** Complaint and First Amended Complaint, Prayer for Relief. Pincham filed his original complaint on June 5, 1987, and, on August 14, 1987, filed his First Amended Complaint, the document considered by the district court in ruling upon the motion to dismiss. The district court noted that copies of the Amended Complaint were circulated to the defendants on or about June 18, 1987, almost two months prior to the Amended Complaint's filing. *Pincham v. Illinois Judicial Inquiry Board,* 681 F.Supp. 1309, 1311 (N.D.Ill.1988).

**4.** Complaint and First Amended Complaint at ¶ 47. The district court's queries of counsel for

the Judicial Inquiry Board confirmed Pincham's allegation that a complaint would be filed against Pincham in the Courts Commission. The district court noted that during its June 8, 1987, hearing on Pincham's request for a temporary restraining order, "counsel for the Inquiry Board informed the Court that the Inquiry Board had indeed determined to file a complaint with the Courts Commission." *Pincham,* 681 F.Supp. at 1320. However, the district court also noted that counsel for the Inquiry Board pledged that the complaint would not be filed until the resolution of the district court proceedings had been resolved. *Id.* In a subsequent February 2, 1988, communication the In-

ham's complaint, alleging that Pincham's action was not ripe for determination, because he had not yet been found guilty of a violation and disciplined. Furthermore, the Courts Commission and the Judicial Inquiry Board alleged that federal courts should not interfere with the ongoing state proceedings under the principles of federalism and comity enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 2d 669 (1971), and that abstention was required under *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pincham,* 681 F.Supp. at 1317–18. After the district court ruled that the case was ripe for adjudication, *Id.* at 1318, 1325, it dismissed the case on the basis of the *Younger* doctrine.[5]

In discussing the *Younger* doctrine, the district court specifically considered the analysis the United States Supreme Court had utilized in applying *Younger* in the attorney disciplinary area,[6] and concluded that this analysis was proper in the context of judicial discipline. *Pincham,* 681 F.Supp. at 1321–22. The district court enunciated the following questions to be considered in determining whether *Younger* abstention applies to Illinois judicial disciplinary proceedings:

"1) [D]o judicial disciplinary hearings within the constitutionally prescribed jurisdiction of the Inquiry Board and the Courts Commission constitute an ongoing state judicial proceeding[?]

2) [D]o the state judicial disciplinary proceedings implicate important state interests[?]

3) [I]s there an adequate opportunity for Justice Pincham to raise his constitutional challenges in the state disciplinary proceedings[?]"

*Id.* at 1322.

The district court concluded that each of these three requirements were met, and

found the Courts Commission to be, in effect, an "independent state court, established by the Illinois Constitution for the express purpose of adjudicating judicial discipline cases," *Id.* at 1323, and a proper recipient of abstention under *Younger.* Proceedings in the Courts Commission were in progress and "ongoing" as the Judicial Inquiry Board had previously voted to file a complaint with the Courts Commission. *Id.* at 1322. With respect to the second question, the district court reasoned that the "state's interest in assuring the integrity and professional conduct of its judiciary is certainly at least as important as its interest in assuring the professional conduct of the attorneys it licenses." *Id.* at 1323. The district court also ruled that "based upon its review of the Rules of Procedure of the Courts Commission as well as [its] findings with regard to the Courts Commission's state constitutional authority, ... the Courts Commission will hear and resolve Justice Pincham's constitutional claims." *Id.* at 1324.

The district court, after reviewing the record, also found that the involved facts and circumstances could not reasonably be interpreted as an exception to the application of the *Younger* doctrine. Since the proceedings were not initiated merely for the purpose of discouraging the exercise of protected rights, the court reasoned that the proceedings were neither brought in bad faith nor to harass Justice Pincham. *Id.* Justice Pincham's allegations of selective prosecution also fell short of providing a basis for a finding of bad faith or harassment, as they failed to specifically compare Pincham to others who had been involved in public speaking. *Id.* Because Justice Pincham had himself argued that the Supreme Court rules could be construed harmoniously with the exercise of protected

---

quiry Board's counsel confirmed that the "Inquiry Board had voted to proceed with the action against Justice Pincham and that they were refraining from filing their now drafted complaint only because of the pledge made to this Court at the inception of this case." *Id.*

5. *Id.* at 1318, 1320–24. In light of its view that *Younger* was controlling, the district court did not find it necessary to decide the *Pullman* abstention issue. *Id.* at 1318.

6. *Middlesex County Ethics Commission v. Garden State Bar Association,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).

rights, the exception to *Younger* for laws which are flagrantly and patently unconstitutional also did not apply. *Id.* at 1325. The district court in its application of the *Younger* doctrine dismissed the plaintiff-appellant's complaint without reaching the merits of the constitutional issues.[7]

## II.

### *Application of the Younger Abstention Doctrine*

■ We agree with the district court that the Supreme Court's decision in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982), sets forth the appropriate analysis when determining whether or not *Younger* required the district court to abstain from interfering with the judicial disciplinary proceedings. In *Middlesex*, 457 U.S. at 432, 102 S.Ct. at 2521, the Supreme Court held that, in ascertaining whether to abstain from interfering with state attorney disciplinary proceedings:

"The question ... is threefold: *first*, do state bar disciplinary hearings within the constitutionally prescribed jurisdiction of the State Supreme Court constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges."

Our first inquiry, then, is whether the district court properly concluded that the proceedings against Justice Pincham were ongoing state judicial proceedings. *See* 681 F.Supp. at 1322. As our previous discussion made clear, Justice Pincham has presented a legal argument in response to the Judicial Inquiry Board's proposed charges and the Inquiry Board has in-

formed the district court "that the Inquiry Board ... indeed determined to file a complaint [against Justice Pincham] with the Courts Commission." *Id.* at 1320. Under these facts the state proceedings against Justice Pincham are "ongoing." In addition, the Courts Commission, the body that will hear the charges to be filed against Justice Pincham, is "judicial in nature," as it is a duly constituted entity that exercises the coercive responsibility of ruling upon alleged violations of Illinois Supreme Court rules subject to procedural limitations like those found in courts. *See* 681 F.Supp. at 1318–20, 1323.

Our conclusion that the proceedings against Justice Pincham are "ongoing" and "judicial in nature" finds support in the United States Supreme Court's decision in a similar case, *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 623–25, 626–29, 106 S.Ct. 2718, 2722–24, 91 L.Ed.2d 512 (1986). In *Dayton Christian Schools*, an administrative agency conducted an investigation of the Dayton Christian Schools' personnel practices, and filed a complaint initiating a formal administrative proceeding against the school. Here, as in *Dayton Christian Schools*, the Judicial Inquiry Board conducted an investigation and has decided to file a complaint against Justice Pincham with the Courts Commission. In both cases the formal proceedings commenced are coercive rather than remedial, as the imposition of back pay liability was possible in *Dayton Christian Schools* and judicial discipline may be imposed in this case. The Supreme Court in *Dayton Christian Schools* relied in particular upon the "coercive" rather than "remedial" nature of the involved proceedings,[8] in holding that *Younger* required a federal district court to abstain from interfering with state civil rights proceedings that were "ongoing"

---

7. Although Pincham cited 42 U.S.C. § 1981 in his complaint, apparently alleging racial discrimination, the district court determined that Pincham abandoned this claim by failing to argue it in his response to the motions to dismiss. 681 F.Supp. at 1312 n. 2. The district court also rejected Pincham's attempt to amend his complaint to allege violations of federal voting rights statutes, 42 U.S.C. §§ 1971(a), 1973(a),

and 1973i(b). *Id.* at 1314–17. Pincham does not raise either of these issues on appeal.

8. *See Dayton Christian Schools*, 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2723 n. 2 (citing "coercive" rather than "remedial" nature of state proceedings as a factor supporting abstention).

and "judicial in nature." The proceedings against Justice Pincham, like the proceedings in *Dayton Christian Schools,* are "ongoing," and are even more clearly "judicial in nature," because they take place before a duly constituted body composed of state court judges rather than before an administrative agency.

We also agree with the trial court that the state judicial disciplinary proceedings brought against Justice Pincham involve the important state interest of preserving a fair and impartial judiciary. *See* 681 F.Supp. at 1323. As the trial court observed: "A state's interest in assuring the integrity and professional conduct of its judiciary is certainly at least as important as its interest in assuring the professional conduct of the attorneys it licenses." *Id. See also Coruzzi v. New Jersey,* 705 F.2d 688, 691 (3d Cir.1983) (Recognizing important state interest in state judicial removal procedures). Indeed, the state of Illinois must be permitted to pursue its vital interest in preserving a fair and impartial judiciary capable of maintaining the respect of its citizens through the avenue of judicial disciplinary proceedings.

Although we have determined that the judicial disciplinary actions brought against the plaintiff-appellant constitute ongoing state judicial proceedings that pursue a vital state interest, application of the *Younger* abstention doctrine would still not pass muster unless the plaintiff-appellant has the opportunity to raise his constitutional challenges in the state judicial proceedings. *See Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. "[T]he burden ... rests on [Justice Pincham] to show 'that state procedural law bar[s] presentation of [his constitutional] claims.'" *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 1528, 95 L.Ed.2d 1 (1987) (quoting *Moore v. Sims,* 442 U.S. 415, 432, 99 S.Ct. 2371, 2382, 60 L.Ed.2d 994 (1979)). As the Supreme Court further observed in *Pennzoil:*

> "We cannot assume that state judges will interpret ambiguities in state procedural law to bar presentation of federal claims. Accordingly, when a litigant has not attempted to present his federal claims in related state court proceedings, a federal court should assume that state procedures will afford an adequate remedy in the absence of unambiguous authority to the contrary."

107 S.Ct. at 1528 (citation omitted).

Justice Pincham, in an attempt to meet his burden of demonstrating the unavailability of a state forum to determine his constitutional claims, cites Illinois Supreme Court precedent that allegedly precludes the Courts Commission from resolving the constitutional questions which might be presented by the application to Justice Pincham of the Supreme Court rules. In *People ex rel. Harrod v. Illinois Courts Commission,* 69 Ill.2d 445, 14 Ill.Dec. 248, 260-61, 372 N.E.2d 53, 65-66 (1977), the Illinois Supreme Court determined that the Courts Commission lacked authority to independently construe an Illinois statute. The court stated:

> "[T]he judicial power in this State is vested solely in the courts. This power includes, among other things, the authority to judicially interpret and construe constitutional provisions and statutes when necessary. Inasmuch as the Commission is not a part of the tripartite court system in this State, it possesses no power to interpret statutory ambiguities or to compel judges to conform their conduct to any such interpretation. This limitation is particularly dictated inasmuch as this court is without the authority to review the correctness of the Commission's orders.... To grant the Commission such authority would interfere with an independent judicial system and would place trial judges in an untenable position. If, as here, the statutory interpretation of the Commission differed from that of the appellate courts, trial judges who followed, as mandated, the guidance of the courts of review, would be subject to sanction by the Commission. The 'framers of the constitution sought to promote certainty and uniformity in the interpretation and declaration of the law. To that end they committed the exercise of these judicial functions to the judicial department.' *People v. Bruner,* (1931), 343 Ill. 146, 159, 175 N.E. 400, 405.

The function of the Commission is one of fact finding. Its function in this case was to apply the facts to the *determined* law, not to determine, construe, or interpret what the law should be."

14 Ill.Dec. at 260–61, 372 N.E.2d at 65–66 (citations omitted, emphasis in original).

The Illinois Supreme Court has tempered its determination in *Harrod* with a subsequent decision in *People ex rel. Judicial Inquiry Board v. Courts Commission*, 91 Ill.2d 130, 61 Ill.Dec. 789, 791–92, 435 N.E.2d 486, 488–89 (1982). In that case the court rejected the argument that the Courts Commission lacked the authority to interpret the Supreme Court rules it applies in disciplinary proceedings. The court stated:

"The Courts Commission is the body with the constitutional responsibility for applying the Rules of Judicial Conduct to particular cases. We conclude that its constitutional authority to hear and determine disciplinary cases necessarily includes the power to interpret the rules it applies in deciding cases before it.

\*   \*   \*   \*   \*   \*

It is ... established that the law which the Commission is to apply in deciding disciplinary cases is the supreme court rules.

The issue, then, is whether the Courts Commission, in the exercise of its duty to apply the rules of judicial conduct to the case before it, has the authority to construe the rules. We conclude that it does. The Commission's function is adjudicative, and interpretation of the legal rule the tribunal is applying is an inherent and inescapable part of the adjudicative process.

\*   \*   \*   \*   \*   \*

This conclusion is not inconsistent with *Harrod's* holding that the Commission does not have the authority to make an independent interpretation of a statute which has been given a different interpretation by a court. Since the Commission is the tribunal with final responsibility for applying the rules of judicial con-

duct to disciplinary cases, there is no possibility that its interpretation of a rule will be at odds with an interpretation by a court. Thus the possibility referred to in *Harrod* of conflicting interpretations creating a dilemma for trial and appellate judges does not arise."

61 Ill.Dec. at 791–92, 435 N.E.2d at 488–89 (citation omitted). The Illinois Supreme Court in *Judicial Inquiry Board*, thus, made clear that the reason for *Harrod's* limitation upon the Courts Commission's authority to construe statutory provisions is the need to prevent the possibility of conflicting constructions of substantive law in decisions rendered by the Courts Commission and the Illinois courts. In *Judicial Inquiry Board*, the Illinois Supreme Court recognized that this conflict in all probability will not arise in cases where the Courts Commission is called upon to interpret Supreme Court rules, because, subject to the limited exception of a mandamus action, the Courts Commission has the ultimate "responsibility for applying the rules of judicial conduct to disciplinary cases," [9] which means that its interpretation of a rule will usually be final and, thus, not in conflict with a court's interpretation of a rule. *See* 61 Ill.Dec. at 792, 435 N.E.2d at 489.

As we previously emphasized, "when a litigant has not attempted to present his federal claims in related state court proceedings, a federal court should assume that state procedures will afford an adequate remedy in the absence of unambiguous authority to the contrary." *Pennzoil*, 107 S.Ct. at 1528. The record in this case fails to reflect facts that tend to demonstrate that the Courts Commission would decline to entertain the constitutional questions Justice Pincham might conceivably present. *See Pincham*, 681 F.Supp. at 1322, 1324. Indeed, the Courts Commission has considered a constitutional challenge to the application of the Supreme Court rules to a judge on at least one previous occasion. *See In re Elward*, 1 Ill.Cts.Comm. 114, 117–20 (1974). *See also* P. Wassenberg, *A Search for Accountabil-*

---

**9.** 61 Ill.Dec. at 792, 435 N.E.2d at 489.

*ity: Judicial Discipline Under the Judicial Article of the 1970 Illinois State Constitution,* 8 Northern Illinois University Law Review 781, 798–99 (1988) (discussing *Elward* and Courts Commission construction of constitutional questions).

We recognize that *Harrod* raises some question concerning the Courts Commission's authority to entertain constitutional challenges. We emphasize, however, that Justice Pincham's case differs from *Harrod.* In ruling upon Justice Pincham's case the Courts Commission is called upon to address legal questions arising from the rules it is charged with enforcing, rather than rules over which it exercises no authority. Yet, this case also differs from *People ex rel. Judicial Inquiry Board v. Courts Commission,* 91 Ill.2d 130, 61 Ill. Dec. 789, 435 N.E.2d 486 (1982) in that the Courts Commission is required to do more than simply interpret the meaning of a Supreme Court rule. In this instance, the Courts Commission would be construing the constitutionality of Supreme Court Rules, over whose application it exercises exclusive jurisdiction. Because Illinois state courts are barred from applying the Supreme Court Judicial Disciplinary Rules, we are convinced that the Courts Commission's rulings on constitutional issues in this limited area would not conflict with those of the courts. Based upon the foregoing discussion, we are confident that the Illinois courts would in all probability construe their constitution so as to permit the Courts Commission to consider federal constitutional mandates when interpreting the Supreme Court rules during the course of a judicial disciplinary proceeding. *Cf. Ohio Civil Rights Commission v. Dayton Christian Schools,* 477 U.S. 619, 629, 106 S.Ct. 2718, 2724, 91 L.Ed.2d 512 (1986) ("[E]ven if Ohio law is such that the Commission may not consider the constitutionality of the statute under which it operates, it would seem an unusual doctrine ... to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles"). Thus, we are convinced that Justice Pincham has failed to present the "unambiguous authority" that Courts Commission proceedings

would provide an inadequate forum for his constitutional claims that is necessary to preclude abstention under *Younger.* See *Pennzoil,* 107 S.Ct. at 1528–29.

III.

*Application of Exceptions to the Younger Doctrine*

■ We must next determine whether the complaint sets forth an exception to the *Younger* doctrine. *See Jacobson v. Village of Northbrook Municipal Corp.,* 824 F.2d 567, 569–70 (7th Cir.1987). In *Jacobson,* 824 F.2d at 569–70, we held that *Younger* does not require that a federal court abstain from enjoining a state proceeding if

"(1) the 'state proceeding is motivated by a desire to harass or is conducted in bad faith,' *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975); (2) there is 'an extraordinarily pressing need for immediate equitable relief,' *Kugler v. Helfant,* 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975); or (3) the 'challenged provision is flagrantly and patently violative of express constitutional prohibitions,' *Moore* [*v. Sims,* 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) ]."

Justice Pincham does not argue that the state judicial disciplinary action was brought against him either with the desire to harass him, much less in bad faith. As we stated in *Collins v. County of Kendall,* 807 F.2d 95, 98 (7th Cir.1986):

"A plaintiff asserting bad faith prosecution as an exception to *Younger* abstention must allege specific facts to support an inference of bad faith. 'The *Younger* rule, as applied in *Hicks* [*v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) ], requires more than a mere allegation and more than a "conclusory" finding to bring a case within the harassment exception.' *Grandco Corp. v. Rochford,* 536 F.2d 197, 203 (7th Cir. 1976). This specific evidence must show that state prosecution 'was brought in bad faith for the purpose of retaliating

for or deterring the exercise of constitutionally protected rights.' *Wilson* [*v. Thompson,* 593 F.2d 1375, 1383 (5th Cir. 1979) ]."

We agree with the district court that Justice Pincham has failed to establish, either in his pleadings or his argument, that the Judicial Inquiry Board and Courts Commission "were 'using or threatening to use prosecutions, *regardless of their outcome,* as instrumentalities to suppress speech.' " *Collins,* 807 F.2d at 101 (quoting *Sheridan v. Garrison,* 415 F.2d 699, 706 (5th Cir. 1969), *cert. denied,* 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685 (1970) (emphasis in original)). *See Pincham,* 681 F.Supp. at 1324. We are also in agreement with the trial court that Justice Pincham's allegations of selective prosecution "are sketchy at best and clearly insufficient to make the requisite showing of bad faith or harassment." *Id.* Even if we accept Justice Pincham's allegation that other judges engaged in activity equivalent to his and were not disciplined, we refuse to conclude that there was "bad faith" absent allegations that the state agencies had some awareness of the other judges' activities and treated them more favorably than Justice Pincham as part of a campaign that used prosecutions, regardless of outcome, to suppress speech. Justice Pincham does not make such allegations.

An "extraordinarily pressing need for immediate equitable relief" is a second possible exception to *Younger. Jacobson,* 824 F.2d at 570. Justice Pincham argues that the threat of self-censorship resulting from the enforcement of this ordinance justifies immediate equitable relief and cites *Sullivan v. City of Pittsburgh,* 811 F.2d 171, 179–80 (3rd Cir.1987), in which the Third Circuit applied this exception in granting a preliminary injunction preventing the closing of an alcoholic treatment center in an equal protection based challenge to a zoning ordinance. However, *Younger* itself disposes of Justice Pincham's argument in this case. In *Younger* it was determined that "a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." 401 U.S. at 51, 91 S.Ct. at 754. The mere presence of "political speech" has no effect upon this analysis. Because Justice Pincham alleges nothing more than that a single state judicial disciplinary proceeding has had a "chilling effect" on his free speech rights, he has failed to establish that "extraordinarily pressing need for immediate equitable relief" required before coming within the purview of this exception to the *Younger* doctrine. *Compare Wooley v. Maynard,* 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977) (An exception to *Younger* applies where "three successive prosecutions were undertaken against Mr. Maynard in the span of five weeks. This is quite different from a claim for federal equitable relief when a prosecution is threatened for the first time").

The final exception to *Younger* occurs in a case in which the challenged provision is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Younger,* 401 U.S. at 53–54, 91 S.Ct. at 755 (quoting *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941)). However, "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith efforts to enforce it." *Id.,* 401 U.S. at 54, 91 S.Ct. at 755. As the district court noted, Justice Pincham himself "appeared before the Inquiry Board and urged that the rules 'did not prohibit [his] constitutionally protected January 31, 1987 Operation P.U.S.H. Community Forum Black History Speech.' " 681 F.Supp. at 1325 (quoting Amended Complaint at ¶ 28). Further, our examination of the rules Justice Pincham challenged reveals that they do not inherently prohibit constitutionally protected speech. Thus, the Courts Commission could well construe the rules in a manner compatible with the constitution. In these circumstances Justice Pincham's allegations are insufficient to satisfy a facial challenge to these rules, and certainly do not establish that the rules are flagrantly and patently unconstitutional.

Because *Younger* required the district court to abstain from enjoining the state judicial disciplinary proceedings brought against Justice Pincham, the district court's dismissal of Justice Pincham's complaint is

AFFIRMED.