SAFE HAVEN SOBER HOUSES, LLC., David Perry and David Fromm, Plaintiffs,

v.

CITY OF BOSTON and City Of Boston Inspectional Services Department, Defendants.

Civil Action No. 07–11700–JLT.

United States District Court, D. Massachusetts.

Oct. 2, 2007.

Andrew J. Tine, Law Office of Andrew Tine, Bristol, RI, for Plaintiffs.

Scott C. Holmes, Susan M. Weise, City of Boston Law Department, Walter H. Porr, Jr., Boston, MA, for Defendants.

### MEMORANDUM

TAURO, District Judge.

Plaintiffs move to stay criminal proceedings pending against Plaintiffs David Perry and David Fromm in Massachusetts Housing Court Department, Boston Division. Presently at issue is Plaintiffs' *Motion for Preliminary Injunction* [# 2] filed on September 12, 2007. After a hearing held on September 20, 2007, Plaintiffs' motion is DENIED. *Younger* abstention and the Anti–Injunction Act prevent this court from intervening in the pending state proceedings.

### Background

Plaintiff Safe Haven Sober Houses, LLC ("Safe Haven") operates eleven "sober houses" in Roxbury, Massachusetts, with the stated purpose of providing "a safe, structured, sober living environment for recovering alcoholics and drug users."[1] Plaintiff David Perry ("Perry") is Executive Director and Manager of Safe Haven and Plaintiff David Fromm ("Fromm") is Manager of Safe Haven.[2] Safe Haven leases its eleven sober houses from Perry, Fromm and several other landlords.[3] According to Safe Haven, each house contains, on average, eight to twelve residents who pay $140 weekly for a bed in the house.[4] All of the Safe Haven houses were built and zoned as single family homes.[5]

In early 2007, after receiving a referral from City Council Member Charles Turner (who had received complaints from his constituents), Defendant City of Boston's Inspectional Services Department ("ISD") began investigating reports of building, zoning and other code violations at the Safe Haven houses.[6] As a result of these investigations, including a series of inspections conducted pursuant to administrative search warrants, ISD issued several notices of housing, zoning and sanitary code violations to Perry and Fromm in March and April of 2007.[7] Among other violations, these included: (1) a failure to secure permits to use certain basements and

---

1. *Pls.' Mem. in Supp. of Their Mot. for a Prelim. Inj.* [# 3] 1 *("Pls.' Mem.")*. Plaintiffs state that Safe Haven does not provide treatment or counseling, nor is it a residential treatment facility or halfway house. *Pls.' Ver. Compl.* [# 1] ¶ 24. Plaintiffs also state that Safe Haven does not receive any public funds, and does not have any contracts with local, state or federal governments. *Id.*

2. *Pls.' Ver. Compl.* ¶¶ 2, 3.

3. *See id.* at ¶¶ 11, 111 (stating who ISD brought proceedings against), 112 (same).

4. *See id.* at ¶¶ 23, 16.

5. *See Def., City of Boston Inspectional Services Dept.'s, Opp'n to Pls.' Mot. for Prelim. Inj.* [# 10] 2, 2 n. 2, Ex. A *("ISD Opp.")*.

6. *See ISD Opp.* 12. The City also notes that it became aware of problems at the Safe Haven houses after several incidents on the property

that required police or emergency medical responses. The City explains, "These serious and unfortunate incidents, along with experiences of neighborhood residents, prompted a public response, caused immediate governmental action and a series of articles in the Boston Herald newspaper." *Defs.' Opp. to Pls.' Mot. for Prelim. Inj.* [# 14] 2–3 *("City Opp.")*.

7. *See Pls.' Ver. Compl.* ¶¶ 78, 82; *City Opp.* Ex. C (copy of the violations issued), 2. With respect to the administrative search warrants, Plaintiffs assert that ISD had warrants for additional properties beyond the Safe Haven homes, but executed the warrants in a manner that targeted Safe Haven. *See Pls.' Ver. Compl.* ¶ 92. ISD denied this allegation at the motion hearing. *See also ISD Opp.* 12 (explaining the necessity of the warrants).

garages as living spaces; and (2) a failure to secure permits to use the properties as "rooming houses" instead of single family residences.[8]

In May 16, 2007, following alleged inaction by Plaintiffs in response to the garage and basement violations, ISD commenced criminal proceedings in Massachusetts Housing Court Department, Boston Division ("Housing Court") against owners of the houses at issue-Perry, Fromm and Steve MacInnis, another Safe Haven landlord.[9] On July 23, 2007, following alleged inaction by Plaintiffs in response to the "rooming house" violations, ISD commenced criminal proceedings in Housing Court against owners of the houses at issue-Perry and Fromm.[10]

In one of the Housing Court criminal matters, a show cause hearing was scheduled for September 17, 2007, and Perry and Fromm were scheduled to be arraigned on September 24, 2007.[11] On September 12, 2007, Safe Haven, Perry and Fromm (collectively "Plaintiffs") sued the City of Boston ("City") and ISD (collectively "Defendants") in this court, asserting that Defendants' desire to "shut down" Safe Haven homes was the real impetus behind ISD's regulatory and criminal enforcement actions.[12]

Plaintiffs also argue that because recovering alcoholics and drug addicts are considered "disabled," residents of the Safe Haven houses qualify for protection under the nondiscrimination provisions of Massachusetts General Laws ("M.G.L.") Chapter 40A,[13] the Fair Housing Act ("FHA"), the Americans With Disabilities Act ("ADA"), and the Rehabilitation Act of 1973.[14] In addition, Plaintiffs claim that M.G.L. Chapter 40A, the FHA and the ADA grant them the right to operate their sober houses without any additional permits and to be free from discrimination and harassment.[15]

Plaintiffs seek injunctive relief, among other things,[16] and filed a motion for a preliminary injunction also on September 12, 2007, seeking "to stay all criminal pro-

**8.** *See ISD Opp.* 3; *City Opp.* 2.

**9.** *See City Opp.* Ex. A 1–20. Matters before the Housing Court are criminal actions if the offense charged is "willful, intentional, reckless or repeated." Mass. Gen. Laws ch. 185C, § 19 (2007).

**10.** *See City Opp.* Ex. A 21–34.

**11.** *Pls.' Mot. for a Prelim. Inj.* [# 2] 2.

**12.** *See, e.g., Pls.' Mem.* 2, 3–5.

**13.** In relevant part, M.G.L. Chapter 40A, Section 3 reads:

Notwithstanding any general or special law to the contrary, local land use and health and safety laws, regulations, practices, ordinances, by-laws and decisions of a city or town shall not discriminate against a disabled person. Imposition of health and safety laws or land-use requirements on congregate living arrangements among non-related persons with disabilities that are not imposed on families and groups of similar size or other unrelated persons shall constitute discrimination. The provisions of this paragraph shall apply to every city or town, including, but not limited to the city of Boston and the city of Cambridge. Mass. Gen. Laws ch. 40, § 3 (2006).

**14.** *See Pls.' Ver. Compl.* ¶¶ 120–130; *Pls.' Mem.* 8–22.

**15.** *See, e.g., Pls.' Ver. Compl.* 117.

**16.** Plaintiffs also seek a declaration that under the relevant statutes, Plaintiffs have a right to continue to operate their sober houses without any additional permits and without being subject to harassment. *See id.* at 16 ¶ 4. In addition, Plaintiffs seek damages in an amount to be determined, attorneys' fees and costs, and any other just relief. *See id.* at ¶¶ 5, 6, 7.

ceedings and the enforcement of alleged violations by the Defendants until the merits of Safe Haven's claims can be determined by this Court." [17]

## Discussion

### A. *Dispute Over the Legal Standard for Determining Whether the Court Can Enjoin the Housing Court Proceedings*

Plaintiffs argue that the court should evaluate Plaintiffs' preliminary injunction motion using the standard four-part test: (1) the likelihood of success on the merits; (2) the potential for irreparable injury; (3) the balancing of the relevant equities; and (4) the effect on the public interest of a grant or denial of the injunction.[18] ISD and the City argue that *Younger v. Harris* governs and, consequently, *Younger* abstention doctrine bars this court from intervening in the Housing Court proceedings.[19] The City also asserts that the Anti–Injunction Act prevents the court from intervening.[20]

### B. *Younger is the Appropriate Standard*

 *Younger* abstention doctrine applies when a party seeks to enjoin a pending state court criminal proceeding,[21] although parties may choose to waive the abstention.[22] Here, Plaintiffs seek to enjoin criminal proceedings pending in the Massachusetts Housing Court Department, Boston Division—a state court in the State of Massachusetts trial court system. Both the City and ISD raise *Younger* as a bar to this court issuing the injunction, and neither the City nor ISD waives the abstention. Accordingly, *Younger* doctrine governs whether this court may intervene.

### C. *Analysis under Younger*

 *Younger* and its progeny bar a federal court from intervening by injunction or declaratory judgment in a pending state

**17.** *Pls.' Mem.* 25.

**18.** *See id.* at 8 (*citing Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 4 (1 st Cir. 1991)).

**19.** *See ISD Opp.* 5–21; *City Opp.* 4. Plaintiffs do not address *Younger* in any of their materials before the court.

**20.** *See City Opp.* 5. The Anti–Injunction Act states that "A court of the United States may not grant an injunction to stay proceedings in a state court except [1] as expressly authorized by Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments." 28 U.S.C. § 2283 (2000).

**21.** *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Although *Younger* involved a state criminal proceeding, the Court later extended *Younger* abstention to include state civil and administrative proceedings that implicated important state interests. *See, e.g. Moore v. Sims*, 442 U.S. 415, 99 S.Ct.

2371, 60 L.Ed.2d 994 (1979) (applying *Younger* to pending state civil proceeding that implicated an important state interest); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (applying *Younger* to pending state civil case that was similar to a criminal proceeding); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (applying *Younger* to pending state administrative proceeding that implicated an important state interest). A companion case to *Younger* extended the abstention doctrine to declaratory judgments that have the potential to interfere with pending state proceedings. *See Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

**22.** *See Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 480, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) ("It may not be argued ... that a federal court is compelled to abstain in every such situation. If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system.").

court criminal proceeding, except under extraordinary circumstances where the threat of irreparable injury is "both great and immediate." [23] In Younger, the Supreme Court acknowledged three limited situations that may constitute such extraordinary circumstances: (1) a statute that is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it;" [24] (2) state prosecutions brought in bad faith without "any expectation of securing valid convictions;" [25] or (3) when it "plainly appears" that pursuing claims in pending state proceedings " 'would not afford adequate protection.' " [26] None of these exceptions applies here.

### 1. The Flagrant and Patently Unconstitutional Statute Exception Does Not Apply

Plaintiffs do not argue, nor is there any indication, that the regulations and ordinances at issue in this case are flagrantly or patently unconstitutional. Accordingly, this exception does not apply.

### 2. The Bad Faith State Prosecution Exception Does Not Apply

 Plaintiffs do not present sufficient evidence to justify a finding of bad faith state prosecution. The exception applies in very limited circumstances when two conditions are met: [27] (1) "a prosecution has been brought without reasonable expectation of obtaining a valid conviction;" and (2) the defendants cannot ade-

**23.** *Younger v. Harris,* 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (reviewing the Court's prior cases addressing the ability of federal courts to enjoin state criminal prosecutions) (internal quotation marks omitted). *See also Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 493, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); *Kugler v. Helfant,* 421 U.S. 117, 123, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). The *Younger* Court "emphatically reaffirmed the fundamental policy against federal interference with state criminal prosecutions," *see Mitchum v. Foster,* 407 U.S. 225, 230, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (internal quotation marks omitted), and based its decision on, *inter alia,* a "national policy of forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances;" doctrines of equity jurisprudence; and considerations of "comity," which the court defined as "proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *See Younger,* 401 U.S. at 41, 43–44, 44, 91 S.Ct. 746. *See also Maymo–Melendez v. Alvarez–Ramirez,* 364 F.3d 27, 31 (1st Cir. 2004) ("*Younger* is a court-made rule of abstention built around the principle that, with

limited exceptions, federal courts should refrain from issuing injunctions that interfere with ongoing state-court litigation, or, in some cases, with state administrative proceedings.").

**24.** *Younger,* 401 U.S. at 53–54, 91 S.Ct. 746 (*quoting Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)).

**25.** *See id.* at 48, 91 S.Ct. 746 (*quoting Dombrowski v. Pfister,* 380 U.S. 479, 482, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)).

**26.** *See id.* at 45 (*quoting Fenner v. Boykin,* 271 U.S. 240, 243–244, 46 S.Ct. 492, 70 L.Ed. 927 (1926)).

**27.** Professor Chemerinsky notes, "[S]ince *Younger,* there is not a single instance in which the Supreme Court has applied this exception and found a state action to constitute a bad faith prosecution." Erwin Chemerinsky, *Federal Jurisdiction* § 13.4 (4th ed.2004). Chemerinsky continues, "In fact, commentators have observed that 'the universe of bad-faith-harassment claims that can be established is virtually empty.' " *Id.* (*citing* Owen M. Fiss, *Dombrowski,* 86 Yale L.J. 1103, 1115 (1977)); C. Keith Wingate, *The Bad Faith–Harassment Exception to the Younger Doctrine: Exploring the Empty Universe,* 5 Rev. of Litig. 123 (1986).

quately assert their claims because of an unavailable or biased state forum.[28] In, *Dombrowski*, the seminal bad faith prosecution case identified in *Younger*, successive state court prosecutions were intended to harass and discourage the vindication of constitutional rights.[29] There, prosecutors allegedly arrested and charged civil rights activists, but had no "expectation of securing valid convictions."[30] Instead, the *Dombrowski* court noted that, allegedly, "threats to enforce the statutes . . . [were] part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana."[31] Under these extraordinary circumstances, the federal court had the power to properly enjoin state criminal enforcement.[32]

Here, Plaintiffs have not established these kinds of circumstances, despite assertions to the contrary. Plaintiffs argue

that local elected officials seek to "shut down" Safe Haven, which is the reason the City and ISD (1) began investigating Safe Haven in the first place, and (2) are now prosecuting Plaintiffs in Housing Court.[33]

As noted above, however, ISD began investigating Safe Haven following a referral by a local elected official and after several incidents at Safe Haven homes required police or emergency medical responses. The City explains, "These serious and unfortunate incidents, along with experiences of neighborhood residents, prompted a public response, caused immediate governmental action and a series of articles in the Boston Herald newspaper."[34] Additionally, although a referral from an elected official led ISD to commence the investigation, ISD maintains that "there is . . . nothing remarkable about this course of conduct."[35]

Additionally, and most relevant to the bad faith analysis, Plaintiffs' allegations do not establish that the City and ISD have "no reasonable expectation of obtaining

**28.** *Kugler v. Helfant*, 421 U.S. 117, 126 n. 6, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). For the requirement that defendants be unable to assert their claims in a state forum, *see, e.g., Moore v. Sims*, 442 U.S. 415, 432, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (holding that the bad faith prosecution exception to *Younger* did not apply because, among other things, state procedural law did not bar presentation of defendants' claims in the state courts, and there was no bad faith or harassment).

**29.** *See Younger*, 401 U.S. at 48–49, 91 S.Ct. 746.

**30.** *Dombrowski*, 380 U.S. at 482, 85 S.Ct. 1116; *Younger*, 401 U.S. at 48, 91 S.Ct. 746.

**31.** *Id.*

**32.** *See Younger*, 401 U.S. at 47, 91 S.Ct. 746 (discussing the *Dombrowski* Court's holding). Chemerinsky explains, "If prosecutors arrest and indict, but dismiss charges before trial, the individual has no opportunity to assert his or her constitutional claim." Chemerinsky,

*supra*, at § 13.4. As a result, "[B]ad faith prosecutions may be challenged and enjoined in federal court." *Id.*

**33.** *See, e.g., Pls.' Mem.* 2, 3–5.

**34.** *City Opp.* 3. Indeed, ISD's investigations pursuant to administrative search warrants led to findings of overcrowding, as well as findings "that individuals were being housed in garages and basements not designed or constructed for safe human habitation." *Id.* In addition, the homes were originally zoned and permitted as single family, and were now being used "as what can best be characterized as a rooming house" without any variances sought or obtained. *See id.* The City also notes that Safe Haven buildings did not comply with the state building or sanitary code. *See id.*

**35.** *ISD Opp.* 12 ("Defendants' Inspectors received a complaint from an elected public official who had, in turn, received it from his constituents.").

... valid conviction[s]" in Housing Court. To the contrary, the City and ISD present specific factual and legal bases for the prosecutions against Plaintiffs, and Defendants' actions and statements indicate that Defendants reasonably expect to convict Plaintiffs.[36]

With respect to the first proceeding, it is not disputed by the parties that Plaintiffs converted garages in some of the Safe Haven houses and basements in others from garage and storage space into living spaces, and did so without seeking change of occupancy or building permits.[37] ISD asserts that such conduct violates the State Building Code, and occupancy of these basements and garages violates the City of Boston Zoning Code.[38] Plaintiffs assert that Safe Haven residents' "disabled" status under M.G.L. Chapter 40, the FHA, the ADA and the Rehabilitation Act exempt Safe Haven from obtaining the necessary permits.[39] Defendants strongly disagree with Plaintiffs' legal conclusion.[40] In addressing this violation, ISD issued notices of violation, and then following alleged inaction by Plaintiffs, "swore out" criminal complaints for the violations.[41]

With respect to the second proceeding, Defendants allege that Plaintiffs, without obtaining proper occupancy permit/certificates, are "clearly" using Safe Haven homes as "rooming houses."[42] Defendants assert that because these houses were built and zoned as single family homes, Plaintiffs' use violates the state Sanitary Code.[43] Defendants point to Plaintiffs' own descriptions of the Safe Haven living arrangements in support of this allegation, and cite cases in support of their characterization of the houses as "rooming houses."[44] Plaintiffs strongly disagree with the "rooming house" characterization, and assert that Safe Haven houses lawfully operate as "single family unit[s] wherein the Residents are regarded as 'family of choice' members to one another and are not considered tenants of Safe Haven."[45] As with the garage and basement violation, Plaintiffs claim protection under M.G.L. Chapter 40A, Section 3, the FHA, the ADA and the Rehabilitation Act, and assert that Safe Haven can operate the sober houses without obtaining any additional permits from the City.[46] Defendants disagree with these assertions, and note, "At worst, Defendants' characterization of the occupancy of the Safe Haven properties represents a complex factual dispute and a legitimate matter for adjudication through the State Housing Court."[47] Like the garage and basement

36. Defendants assert that these factual bases were obtained via investigations conducted pursuant to lawfully issued and executed administrative search warrants and information from the Plaintiffs' themselves. *See id.* at 2–3, 12–13.

37. *See id.* at 3. Plaintiffs also did not dispute this at the motion hearing.

38. *See id.* at 2–3. *See also City Opp.* Ex. A 1–20.

39. *See Pls.' Ver. Compl.* 16 ¶ 4.

40. The court does not address this legal question. Unlike the standard preliminary injunction analysis, the analysis here is limited to

whether the federal court may intervene in the state proceedings.

41. *See ISD Opp.* 3.

42. *See id.* at 16.

43. *See id.* at 16–17; *See also City Opp.* Ex. A 21–34.

44. *See id.* at 16–20.

45. *Pls.' Ver. Compl.* ¶ 21.

46. *See id.* at 16 ¶ 4.

47. *ISD Opp.* 20. Again, the court does not address this legal question because this analy-

violation, in addressing this violation, ISD issued notices of violation, and then following alleged inaction by Plaintiffs, "swore out" criminal complaints.[48]

In both criminal proceedings, Defendants assert that their sole purpose is to enforce compliance with applicable codes and ordinances and to protect the residents of Safe Haven, not to harass the Plaintiffs or shut down Safe Haven. The City states,

> There is also no argument here that the matter in housing court is brought in bad faith or for the purpose of harassing the Plaintiffs. This is the only action brought by the City against these Plaintiffs, an action based upon specific infractions or violations determined by trusted housing officials and for the purpose of compelling compliance with certain codes and ordinances. Furthermore, this action is pending in a court of competent jurisdiction, which is specially designed to handle matters dealing with housing and in a court that guarantees the Plaintiffs all constitutional rights, including a right to trial by jury and appeal from the decision. None [sic] action taken by the City's [sic] has been for the purposes of shutting down Safe Haven, which has continued to operate without interference by the City, pending a final determination by the housing court. None of the City's actions have [sic] been intended to infringe upon the rights of the residents of Safe Haven. On the contrary, the City has acted to enforce the rights of the residents and to protect them from the misconduct of Perry and Fromm.[49]

In addition, although there are two "successive" proceedings pending in Housing Court—initiated, respectively, in May and July of 2007—Plaintiffs present no evidence that Defendants commenced the "successive" proceedings with the intent to harass. Each proceeding addresses a different violation and does not involve all the same parties. ISD initiated the May 2007 action against Perry, Fromm and one additional Safe Haven landlord for the alleged failure to secure permits to use certain basements and garages as living spaces.[50] ISD initiated the July 2007 proceeding against Fromm and Perry for failure to secure permits to use the properties as "rooming houses" instead of as single family residences.[51] Moreover, beyond the pending Housing Court actions, ISD has not pursued any additional "successive" prosecutions.[52]

Plaintiffs, therefore, have not established that the City and ISD intend to harass but not convict Perry and Fromm in Housing Court. Indeed, it appears that both the City and ISD have a reasonable expectation of obtaining a conviction in Housing Court (and, in fact, hope to obtain a conviction to force compliance). There is no evidence before the court that suggests otherwise. Additionally, as explained in the following section, Plaintiffs have an unbiased state forum available in which to pursue their claims.

3. *The Unavailability of an Adequate State Forum Exception Does Not Apply*

 ██ Plaintiffs also fail to establish the unavailability of an adequate state forum.

---

sis is limited to whether the federal court may intervene in the state proceedings.

48. *See id.* at 3.

49. *City Opp.* 6.

50. *See id.* at Ex. A 1–20.

51. *See id.* at Ex. A 21–34.

52. *See id.* at 6 ("This is the only action brought by the City against these Plaintiffs …").

The Supreme Court has found a state forum to be unavailable in two situations: (1) when the state forum is biased or (2) when a state forum cannot provide a remedy.[53] Here, Plaintiffs never claim that the Housing Court itself is biased. Additionally, Plaintiffs have several state forums available to them, all of which can provide a remedy. First, Plaintiffs may raise their state and federal statutory challenges in Housing Court, either in the pending criminal proceedings or a separate civil proceeding. The Housing Court has superior and general subject matter jurisdiction in this area,[54] and possesses "common law and statutory jurisdiction concurrent with the divisions of the district court department and the superior court department of all crimes and civil actions arising in the City of Boston ..."[55] The Housing Court has "all the powers of the superior court department," which includes, among many other things, the power to grant temporary restraining orders and preliminary injunctions, and the power to enforce orders, preliminary injunctions and judgments.[56] The Housing Court also has the ability to provide for jury trials when required by the United States or Massachusetts constitutions.[57] Furthermore, the Housing Court can also report "important or doubtful questions of law" to the state Appeals Court.[58] Second, Plaintiffs may pursue their state and federal statutory challenges in a separate Massachusetts District Court Department ("District Court") or Massachusetts Superior Court

---

**53.** *See Gibson v. Berryhill,* 411 U.S. 564, 575–579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (holding, among other things, that the district court's finding of state court bias justified exception to *Younger* bar). *See also Kugler v. Helfant,* 421 U.S. 117, 125 n. 4, 95 S.Ct. 1524, 44 L.Ed.2d 15 (discussing *Gibson* ); *Esso Std. Oil Co. (P.R.) v. Mujica Cotto,* 389 F.3d 212, 218 (1st Cir.2004) (discussing *Gibson* ). In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), plaintiffs were a class of prisoners who were arrested and held for trial on prosecutors' informations. *See id.* at 105–106, 95 S.Ct. 854. Plaintiffs asserted a right to a judicial determination of probable cause under the Fourth Amendment. *See id.* at 106, 95 S.Ct. 854. Because no state forum was available to address their claims, the district court ordered the state authorities to provide immediate hearings. *See id.* at 107–108, 95 S.Ct. 854. The Supreme Court disagreed about the type of hearing required, but held that the Fourth Amendment required a judicial determination of probable cause. *See id.* at 126, 95 S.Ct. 854.

**54.** *See* Mass. Gen. Laws ch. 185C, § 2 (2007). *See also id.* at § 3 ("jurisdiction under the provisions of common law and of equity and any other general or special law, ordinance, by-law, rule or regulation as is concerned directly or indirectly with the health, safety, or welfare, of any occupant of any place used, or intended for use, as a place of human habitation and the possession, condition, or use of any particular housing accommodations or household goods or services situated therein or furnished in connection there with or the use of any real property and activities conducted there on as such use affects the health, welfare and safety of any resident, occupant, user or member of the general public and which is subject to regulation by local cities and towns under the state building code, state specialized codes, state sanitary code, and other applicable statutes and ordinances. The divisions of the housing court department shall also have jurisdiction of all housing problems, including all contract and tort actions which affect the health, safety and welfare of the occupants or owners thereof, arising within and affecting residents in the city of Boston, ... and shall also have jurisdiction in equity ... of all cases and matters so arising.").

**55.** *See id.* at § 3.

**56.** *See id.*

**57.** *See id.* at § 21.

**58.** *See Gordon v. Fay,* 382 Mass. 64, 413 N.E.2d 1094, 1096 (1980) ("judges of the Housing Court may report important or doubtful questions of law to the Appeals Court pursuant to Mass. R.Crim. P. 34.")

Department ("Superior Court") action.[59] Both the District Court and Superior Court have concurrent jurisdiction over housing issues, as well as general civil jurisdiction.[60]

### 4. *No Threat of Irreparable Injury "Both Great and Immediate"*

■ Even outside the three established *Younger* exceptions, Plaintiffs fail to establish other exceptional circumstances creating a threat of irreparable injury "both great and immediate." In *Kugler*, the Supreme Court noted that "the Court in *Younger* left room for federal equitable intervention in a state criminal trial where ... there exist 'other extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment.' " [61] The Court continued later in the opinion:

> Only if "extraordinary circumstances" render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. *But whatever else is re-*

*quired, such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief,* not merely in the sense of presenting a highly unusual factual situation.[62]

Here, Plaintiffs have not established "an extraordinarily pressing need for" intervention by this court in the Housing Court proceedings. Most importantly, Plaintiffs have not demonstrated how allowing the state court proceedings to move forward would necessarily result in the closure of Safe Haven and eviction of its residents. Plaintiffs claim that "[i]f Safe Haven is forced to change its occupancy to a Rooming House, it will be deemed in non-compliance with the zoning for the neighborhood of Roxbury in which it is located." [63] In turn, "[t]his will result in immediate closure by Defendants." [64] At this point, however, there has yet to be a trial on the merits in the state court addressing the violations, or even the beginning of a trial on the merits. Indeed, at the time this opinion is being written, Defendants had just been arraigned. Additionally, even if there is a trial on the merits and Defendants are convicted, that does not necessarily mean that Safe Haven must close. The Housing Court may impose a fine, order compliance with regulations, or impose some other punishment that does not result in closure of the houses and eviction of the tenants. Furthermore, Plaintiffs

---

59. Whether the Superior or District Court has jurisdiction depends on the amount in controversy. The Superior Court generally has jurisdiction in civil actions where the amount in controversy is greater than $25,000. *See* Mass. Gen. Laws ch. 212, § 3 (2007). The District Court generally has jurisdiction in civil actions where the amount in controversy is less than or equal to $25,000. *See id.* at ch. 218, § 19.

60. *See id.* at ch. 185C, § 3; *id.* at ch. 218, § 19; *id.* at ch. 212, § 3.

61. *Kugler v. Helfant,* 421 U.S. 117, 124, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975) (*quoting Younger,* 401 U.S. at 53, 91 S.Ct. 746). *See also Moore v. Sims,* 442 U.S. 415, 432–433, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

62. *Kugler,* 421 U.S. at 124–125, 95 S.Ct. 1524 (emphasis added).

63. *Pls.' Mem.* 22.

64. *Id.*

can appeal any adverse Housing Court judgment in the normal course. Lastly, from ISD's standpoint, "[a]s a matter of practice and policy," ISD "automatically and regularly allows for the maintenance of the status quo during the prosecution of the case while the necessary permit application is pending before the Zoning Board of Appeals." [65] And so, because closure of Safe Haven as a result of these proceedings remains far from certain, Plaintiffs fail to demonstrate a threat of irreparable injury "both great and immediate." Accordingly, *Younger* abstention bars the court from intervening in the Housing Court proceedings.

### D. *Anti–Injunction Act Analysis*

■■■ The Anti–Injunction Act ("AIA") also applies to Plaintiffs' motion for a preliminary injunction and prevents the court from enjoining the pending Housing Court proceedings. The Anti–Injunction Act states that "[a] court of the United States may not grant an injunction to stay proceedings in a state court except [1] as expressly authorized by Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments." [66] An injunction may be necessary in aid of the court's jurisdiction in two limited situations: (1) when state cases are removed to the federal court; [67] and (2) where the federal court in an in rem or quasi in rem action is the first to acquire jurisdiction or control over the property. [68] In both these situations, the federal court may enjoin the state proceedings. [69] The third exception, also known as the "relitigation exception," permits a federal court to enjoin state courts from relitigating cases and controversies already adjudicated by the federal court. [70] By enjoining the subsequent proceedings, the federal court "protect[s] or effectuate[s] its judgments."

Here, Plaintiffs seek to enjoin proceedings pending in the Massachusetts Housing Court Department, Boston Division—a state court. The AIA applies, therefore, and bars this court from intervening, unless one of the three enumerated exceptions apply. With respect to the first exception, Plaintiffs do not assert that any federal statute authorizes an exception to the AIA under these circumstances, nor is the court aware of any such statute. The second exception does not apply because this case has not been removed from state

---

**65.** *ISD Opp.* 15. ISD also notes, "Indeed, until the permit cycle runs its course, no one knows what the ultimate determination will be as to the occupancy and the numbers of occupants for each of the dwellings used by the Plaintiffs as sober houses." *Id.* at 11.

**66.** 28 U.S.C. § 2283 (2000).

**67.** *See id.* (Revision Notes and Legislative Reports 1948 Acts).

**68.** *See, e.g., Mitchum v. Foster,* 407 U.S. 225, 235, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Mandeville v. Canterbury,* 318 U.S. 47, 48–49, 63 S.Ct. 472, 87 L.Ed. 605 (1943).

**69.** *See* 28 U.S.C. § 2283 (Revision Notes and Legislative Reports 1948 Acts); *Mandeville,* 318 U.S. at 48–49, 63 S.Ct. 472.

**70.** *See* 28 U.S.C. § 2283 (Revision Notes and Legislative Reports 1948 Acts). In *Toucey v. New York Life Ins. Co.,* the Supreme Court held that a federal court could not enjoin state courts from relitigating issues and cases already decided in the federal court. 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941). The drafters of the updated AIA noted that the revised statute specifically permits a federal court to "protect or effectuate its judgments," which "restores the basic law as generally understood and interpreted prior to the *Toucey* decision." 28 U.S.C. § 2283 (Revision Notes and Legislative Reports 1948 Acts). *See also Mitchum v. Foster,* 407 U.S. 225, 235, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

court, nor is this an in rem action in which the court is the first to acquire jurisdiction over property. The third exception also does not apply, because this court has not issued any earlier judgments that may be denied preclusive effect in the Housing Court proceedings.[71] This court, therefore, has no need to enjoin the proceedings in the Housing Court to protect or effectuate one of its judgments. Because none of the three exceptions applies, the AIA also precludes this court from enjoining the pending proceedings in Housing Court.

### E. Note on the First Circuit's Decision in Rossi v. Gemma

A question may arise regarding the applicability of the First Circuit's recent decision in *Rossi v. Gemma*.[72] In *Rossi*, the court noted,

> The *Younger* doctrine is based on principles of comity, and unless there are extraordinary circumstances, it instructs federal courts not to "interfere with ongoing state-court litigation, or, in some cases, with state administrative proceedings." *Maymo–Melendez v. Alvarez–Ramirez*, 364 F.3d 27, 31 (1st Cir.2004); *see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 ... (1982). Although the doctrine is frequently associated with state criminal prosecutions, it has been extended to certain "coercive" civil cases ... Following Supreme Court case law, *see Middlesex County*, 457 U.S. at 432, 102 S.Ct. 2515, we have articulated the basic analytical framework for *Younger* abstention. Abstention is appropriate when

the requested relief would interfere (1) with an ongoing state judicial proceeding; (2) that implicates an important state interest; and (3) that provides an adequate opportunity for the federal plaintiff to advance his federal constitutional challenge. *See Brooks v. N.H. Supreme Court*, 80 F.3d 633, 638 (1st Cir.1996); *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 777 (1st Cir.1990).[73]

Although the discussion in the excerpted passage focuses on *Younger* abstention in the civil and administrative proceeding context, it may appear that the three-part test articulated by the Court of Appeals also applies to *Younger* abstention in the criminal context. But, based on *Younger*, the Rossi case itself, as well as the cases cited in the excerpted passage, it is the belief of this court that the First Circuit's three-part test applies only when evaluating *Younger* abstention in the context of pending state civil or administrative proceedings. First, *Younger* involved a pending state criminal proceeding, and the Supreme Court did not require that the criminal proceeding implicate an important state interest beyond the state's interest in enforcing its laws. Indeed, the Court's rationales for abstention—"national policy of forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances;" equity doctrines; and notions of "comity,"—were most strongly applicable to state *criminal* proceedings.[74] Second, the Rossi case itself involved a non-criminal, state court lien enforcement petition.[75] Third, the Rossi Court discusses the three-part test

---

**71.** Indeed, the Housing Court proceedings started in May and July of 2007, and the instant matter came before this court in September of 2007.

**72.** 489 F.3d 26 (1st Cir.2007).

**73.** *Rossi*, 489 F.3d at 34–35.

**74.** *See Younger*, 401 U.S. at 43–44, 91 S.Ct. 746.

**75.** *See Rossi*, 489 F.3d at 27.

immediately after stating that *Younger* has "been extended to certain 'coercive' civil cases." Fourth, the *Bettencourt* case cited above makes this distinction explicit:

In *Younger v. Harris* ... the Supreme Court held that the federal courts must defer to ongoing state criminal proceedings. Since *Younger*, deference has been similarly required to *ongoing, originally state-initiated civil or even administrative proceedings that satisfy three conditions:* (1) the proceedings are judicial (as opposed to legislative) in nature; (2) they implicate important state interests; and (3) they provide an adequate opportunity to raise federal constitutional challenges.[76]

Fifth, in *Middlesex County*, the Supreme Court extended application of *Younger* abstention to pending state administrative proceedings, and stated, "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." [77] The *Middlesex* "important state interest" analysis therefore only applies when *Younger* abstention extends beyond the criminal context. Lastly, the *Brooks* case articulates the three-part test while discussing the Supreme Court's decision in *Middlesex County*.

 Accordingly, the First Circuit's three-part *Younger* test, including the state interest analysis, only applies to situations involving pending state civil or administrative proceedings. Here, the pending proceedings are criminal. This court therefore applied traditional *Younger* analysis and followed the standards articulated in *Younger* and subsequent Supreme Court cases.[78]

**Conclusion**

For these reasons, Plaintiffs' *Motion for Preliminary Injunction* is DENIED. An order issued on September 19, 2007.

---

76. *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772, 777 (1st Cir.1990) (emphasis added).

77. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

78. It should be noted, however, that the result of the analysis would be the same—abstention—even if this court employed the three-

part test identified in Rossi. Here, the pending Housing Court prosecutions are ongoing state judicial proceedings. The state has an important interest in enforcing building, zoning, sanitary and safety regulations and protecting the residents of the sober houses. Lastly, as noted below, the Housing Court proceedings provide Plaintiffs with an adequate opportunity to raise any constitutional challenges.